PHIPPS PRODUCTS CORP. vs. MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY.

Suffolk.   September 13, 1982. — December 7, 1982.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, & NOLAN, JJ.

*Massachusetts Bay Transportation Authority. Contract,* Sale of real estate,
Bidding for contract. *Real Property,* Specific performance. *Estoppel.*

An unsuccessful bidding process pursuant to G. L. c. 161A, § 5 (*b*), under-
taken in 1977 by the Massachusetts Bay Transportation Authority with
respect to the sale of a parcel of land and a building thereon owned by
it, followed by an additional comprehensive selling effort, did not ful-
fil the statutory bidding requirements as applied to the Authority's
acceptance in 1978 of a private offer for purchase of the property.
[690-691]

Where the Massachusetts Bay Transportation Authority failed to comply
with the bidding requirements of G. L. c. 161A, § 5 (*b*), respecting a
proposed sale of a parcel of land and the building thereon owned by it,
its omissions were not rendered insignificant either by the Authority's
unsuccessful solicitation of bids one year before it accepted a private
offer for purchase of the property or by the Authority's comprehensive
selling effort that culminated in the private offer, and thus invalida-
tion of the agreement for purchase and sale of the property was
required in order to fulfil the Legislature's purpose in prescribing a
bidding procedure.   [691-693]

The Massachusetts Bay Transportation Authority was not barred by prin-
ciples of estoppel, or otherwise, from relying on its own failure to com-
ply with the bidding requirements of G. L. c. 161A, § 5 (*b*), in seeking
to avoid an agreement to convey real property owned by it.   [693-694]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 19, 1979.

A motion for summary judgment was heard by *Furnari,*
J., a District Court judge sitting under statutory authority.

The Supreme Judicial Court granted a request for direct
appellate review.

*Albert E. Good* for the defendant.

*Gerald Gillerman* (*Steven M. Sayers* with him) for the plaintiff.

WILKINS, J. The defendant Massachusetts Bay Transportation Authority (MBTA) declined to carry out its expressed obligation to sell premises at 500 Arborway in Boston to the plaintiff Phipps Products Corp. (Phipps). That obligation was set forth in a purchase and sale agreement, dated May 18, 1978, between the MBTA and Phipps. The MBTA refused to transfer the property on the ground that it had not complied with the bidding requirements of G. L. c. 161A, § 5 (*b*), concerning the sale of MBTA real estate. Summary judgment was entered for the MBTA on Phipps's complaint for specific performance of the agreement to sell the property. We agree that the MBTA did not comply with the bidding statute and that, although the undisputed facts show that the MBTA turned to its own failure to comply with G. L. c. 161A, § 5 (*b*), to avoid the sale, the MBTA is not barred by principles of estoppel, or otherwise, from relying on the omission.

We set forth the undisputed material facts, derived from depositions and documents presented in support of Phipps's motion for summary judgment. The Arborway building, built in 1962, had been used as the administrative building of the Metropolitan Transit Authority, the predecessor of the MBTA. In 1977, the MBTA concluded that its administrative offices should be consolidated in downtown Boston and that the Arborway property should be sold. The MBTA sought bids on the property and engaged Carpenter & Company, Inc. (Carpenter), as broker for the purpose of selling the property. Carpenter conducted an active advertising campaign. Advertisements were placed in various publications, and an advertisement, a typical legal notice, was published for three successive weeks in the Boston Globe. Bids were to be filed by April 15, 1977, and the successful bidder announced on April 30, 1977. Interest in the property was slight; only one bid (at $100,000) was received by April 15, and it was rejected.

The MBTA decided to continue to market the property. Other brokers were given an opportunity to sell the property.

Major real estate brokers were advised that the property was available. The MBTA continued to have a known, active interest in disposing of the property.

On May 8, 1978, more than one year after the deadline for the receipt of bids pursuant to MBTA's notice, Carpenter delivered an offer from Phipps to purchase the Arborway property for $525,000. On May 10, 1978, the MBTA directors voted to accept Phipps's offer in principle and to authorize the chairman of the MBTA to negotiate the terms of a purchase and sale agreement. The chairman gave the MBTA advisory board notice of the proposed sale, as required by § 5 (b). The advisory board made no objection to the sale.

On May 18, 1978, the MBTA and Phipps executed an agreement for the sale of the Arborway property to Phipps for $525,000 cash, with a deposit of $25,000. The MBTA directors ratified the agreement. The agreement provided that the MBTA "will comply with all the provisions of Section 5 of Chapter 161A of the Massachusetts General Laws." No further advertisement of the sale was placed in any newspaper, nor were further bids sought. Four extensions for completion of the transaction were agreed to, one of which Phipps sought and was granted on Phipps's making a further payment of $10,000. The date finally set for the closing was March 5, 1979.

On January 29, 1979, Robert L. Foster took office as chairman and chief executive officer of the MBTA. He concluded that the MBTA should, if legally possible, reverse its decision to abandon the Arborway property. He asked the MBTA's general counsel, who had approved the purchase and sale agreement and the extensions, to determine whether there was any basis for declining to carry out the agreement to sell the property. The MBTA's general counsel advised Foster that, because it did not strictly adhere to public bidding requirements, the MBTA would probably have no problem in retaining ownership of the building. On March 5, 1979, Phipps tendered a certified check for $490,000, but the MBTA refused to convey the property by quitclaim deed

on the ground that the conveyance would be invalid because of the MBTA's noncompliance with § 5 (*b*).

On July 19, 1979, Phipps filed a complaint seeking specific performance of the purchase and sale agreement. Summary judgment for the MBTA followed, and Phipps has appealed. We granted Phipps's application for direct appellate review.

1. The MBTA did not fully comply with the requirements of G. L. c. 161A, § 5 (*b*), with respect to the proposed sale to Phipps. That section, which is set forth in full in the margin,[1] requires that timely notice of any sale be sent to the advisory board. That was done as to the proposed sale to Phipps. Section 5 (*b*) also requires that any sale of real estate be advertised in an appropriate newspaper for at least once a week for three successive weeks. Such a series of advertisements was published in 1977. It could be argued that the MBTA's active marketing of the Arborway property after the bidding period ended in April, 1977, gave continuing validity to the initial advertisements so as to warrant the conclusion that the purposes of the advertising requirements of § 5 (*b*) had been fulfilled. If, however, as we conclude, new bids were required in order to sell the property to Phipps, new advertisements were also necessary. The third requirement of § 5 (*b*) — that the property "be sold to the highest bidder" — was not met. That requirement by inference imposes a date by which bids will be received, opened, and considered. Although procedures to be followed are not stated as fully in § 5 (*b*) as in certain other public bid-

---

[1] General Laws c. 161A, § 5 (*b*), as appearing in St. 1966, c. 636, states:

"(*b*) No real estate shall be sold unless notice of the intent to sell such real estate shall have been given to the advisory board not less than thirty days prior to the date of sale and unless the sale shall have been advertised at least once a week for three successive weeks prior to the date of sale in a newspaper of general circulation in the city or town in which the real property to be sold is located; provided that no such advertising shall be required if a sale or conveyance of such real estate is made to the commonwealth or any political subdivision thereof or to any agency or instrumentality of either of them. Such real property shall, unless sold to the commonwealth or any political subdivision thereof or to any agency or instrumentality of either of them, be sold to the highest bidder."

ding statutes,[2] the concept of a deadline for the receipt of bids is inherent in § 5 (b) because only by such a process can the MBTA determine with certainty who the highest bidder is.

Section 5 (b) grants the MBTA no authority to dispense with the requirement that it sell to the highest bidder, if it sells at all. This conclusion is reinforced by a 1966 amendment of § 5 (b) that eliminated the MBTA's authority under § 5 (b) to sell to other than the highest bidder where it found that "sound reasons in the public interest require otherwise." Compare G. L. c. 161A, § 5 (b), as appearing in St. 1966, c. 636, with G. L. c. 161A, § 5 (b), inserted by St. 1964, c. 563, § 18. Even under § 5 (b) before its 1966 amendment, a bidding procedure had to be followed.

The fact that Phipps's private offer to purchase the Arborway property was the best offer the MBTA received following a yearlong, comprehensive selling effort does not satisfy the requirement that there be bids. Nor did the bidding process undertaken in 1977 fulfil the bidding requirements as applied to the 1978 proposed sale to Phipps. The 1977 bidding process had been concluded more than one year before Phipps submitted its offer.

2. We come then to the consequences of the MBTA's failure to comply with the bidding requirements of § 5 (b). For the moment, we put aside the question whether, in the circumstances, the MBTA may properly assert its own failure to comply with the statute. Here, we are concerned with what the Legislature intended to result from any failure to comply with § 5 (b). Section 5 (b) does not explicitly state that a failure to comply with its requirements renders void an agreement to sell MBTA real estate.

The general rule in this Commonwealth is that failure to adhere to statutory bidding requirements makes void a contract entered into without such compliance. Statutory bid-

---

[2] See, e.g., St. 1952, c. 354, § 5 (g), inserted by St. 1971, c. 660, § 2, applicable to the Massachusetts Turnpike Authority, calling for sealed bids to be opened publicly at a stated time and place; G. L. c. 149, §§ 44A-44H (public buildings); G. L. c. 7, §§ 40H-40J (sale or lease of certain real property).

ding procedures are designed to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally. See *Datatrol Inc.* v. *State Purchasing Agent,* 379 Mass. 679, 696-697 (1980); *Interstate Eng'g Corp.* v. *Fitchburg,* 367 Mass. 751, 757-758 (1975); *Morse* v. *Boston,* 253 Mass. 247, 252 (1925). To effectuate these purposes, as the opinions just cited show, contracts made in violation of bidding requirements have generally been held to be unenforceable. See *Adalian Bros.* v. *Boston,* 323 Mass. 629, 631-632 (1949); *Burt* v. *Municipal Council of Taunton,* 272 Mass. 130, 133-134 (1930), *S.C.,* 275 Mass. 535, 542-543 (1931); *Safford* v. *Lowell,* 255 Mass. 220, 227 (1926); *Bowditch* v. *Superintendent of Sts. of Boston,* 168 Mass. 239, 243 (1897). This court has required strict adherence to bidding requirements even where no harm to the public authority was shown (*Bowditch* v. *Superintendent of Sts. of Boston, supra* at 244); where the violation benefited the public (*Grande & Son* v. *School Hous. Comm. of N. Reading,* 334 Mass. 252, 258 [1956]; *East Side Constr. Co.* v. *Adams,* 329 Mass. 347, 352 [1952]); and where there was no showing of bad faith or corruption (*Gifford* v. *Commissioner of Pub. Health,* 328 Mass. 608, 617 [1952]).

There are, however, circumstances in which noncompliance with bidding requirements has been characterized as technical rather than substantive, as a minor deviation not requiring invalidation of a bid or a contract. See *Lawrence* v. *Falzarano,* 380 Mass. 18, 22 (1980); *Chick's Constr. Co.* v. *Wachusett Regional High School Dist. Comm'n,* 343 Mass. 38, 41 (1961), and cases cited. The question is whether invalidation is necessary in order to fulfil the legislative purpose. *Lawrence* v. *Falzarano, supra* at 23-25.

We conclude that the violation was not insignificant and, therefore, in order to fulfil the public purpose of § 5 (*b*), the agreement is not enforceable against the MBTA. The 1977 bidding process was unsuccessful. Surely, the fact of an earlier bidding procedure cannot authorize a future private

sale of property. Nor does the continuing process of actively trying to sell the property justify the failure to seek bids anew. Indeed, the purchase and sale agreement expressly acknowledged the existence of § 5 (*b*) and the MBTA's future obligation to comply with it.

3. Finally, Phipps argues that the MBTA should be estopped from relying on its own failure to seek new bids because the MBTA initially proceeded on the assumption that further bids were not required, and then turned to the alleged violation of § 5 (*b*) only when it had a change of heart (and administration) and was searching for a means of backing out of its commitment. This court would extend little sympathy to a private citizen who acted similarly in a private transaction. The MBTA accepted funds from Phipps, asked for extensions of the closing date, created the impression that it was going to sell the property, acted as if it believed that all requirements had been met, and, upon a change of mind, tried to escape its obligation by relying on its own omission.

On the other hand, as the cases discussed in the previous section of this opinion show, the public interest in compliance with bidding procedures established by law overrides the equities that would appropriately be considered in a purely private transaction. There is an initial question whether Phipps, which was bound to take notice of statutory requirements (see *Marlborough* v. *Cybulski, Ohnemus & Assocs.*, 370 Mass. 157, 160 [1976]; *Galassi Mosaic & Tile Co.* v. *Boston,* 295 Mass. 544, 549 [1936]) and was in fact aware of § 5 (*b*), could be said to have reasonably relied to its detriment on the MBTA's representations and conduct. Even if that reliance were reasonable, we think the public interest in adherence to statutory bidding procedures overrides any equitable considerations. This court has been reluctant to apply principles of estoppel to public entities where to do so would negate requirements of law intended to protect the public interest. See *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 162 (1977) (zoning law); *New City Hotel Co.* v. *Alcoholic Beverages Control*

*Comm'n,* 347 Mass. 539, 542 (1964) (liquor laws). In *Doris* v. *Police Comm'r of Boston,* 374 Mass. 443, 449 (1978), concerning a long-standing nonenforcement of residency requirements for Boston police officers, we said, "It would indeed be a most serious consequence if we were to conclude that the inattention or inactivity of government officials could render a statute unenforceable and thus deprive the public of the benefits or protections bestowed by the Legislature. The plaintiff cites no decision of this court that would support his position in this regard. The public interest in the enforcement of the laws of the Commonwealth cannot be defeated by failures of public officials to perform their duties." Although the MBTA's conduct would hardly qualify it for a "sportsmanship" award and although Phipps may reasonably conclude that it was treated most unfairly, a decision in Phipps's favor would seriously threaten the integrity of the processes ordered by the Legislature.

4. We thus conclude that the summary judgment in favor of the MBTA was substantially correct. Although, except for a general prayer for relief, Phipps makes no claim for the refund of the $35,000 paid to the MBTA, we think the MBTA should refund that amount with interest. The MBTA asserts before us that, at one point in the dispute, it made an offer to refund the $35,000. If, within thirty days of the issuance of the rescript from this court, Phipps moves to amend its complaint to seek the refund of the $35,000 with interest that motion should be allowed, based on what appears on the record before us, and summary judgment should be entered in favor of Phipps in the amount of $35,000 plus interest. If no such motion is filed within the indicated time period, summary judgment for the MBTA will be affirmed.

*So ordered.*