AMDAHL CORPORATION *vs*. BUREAU OF SYSTEMS POLICY AND PLANNING & others.[1] No. 88-P-447. November 9, 1988. *Contract*, Bidding for contract. *Commonwealth*, Purchasing.

Amdahl Corporation (Amdahl), a disappointed bidder for a contract for the procurement of a mainframe computer, challenges the award of that contract by the Commonwealth[2] to National Advanced Systems Corporation

---

[1] Bureau of computer services; office of management information systems; the Executive Office for Administration and Finance; director, bureau for systems policy and planning; director, office of management information systems; director, bureau of computer services; Secretary of the Executive Office for Administration and Finance; Comptroller of the Commonwealth; National Advanced Systems Corporation, intervener.

[2] The procurement of data processing equipment by executive agencies of the Commonwealth is governed by regulations promulgated by the Executive Office for

(NAS). Prior to trial, a judge of the Superior Court enjoined payment to NAS pending adjudication of Amdahl's claims. On appeal, Amdahl claims that (1) the award of the contract to NAS violated competitive bidding requirements, (2) the trial judge erred in ruling that Amdahl had an adequate remedy at law in the form of bid preparation costs, and (3) Amdahl is entitled to an order setting aside the contract with NAS and awarding the contract to Amdahl.[3] We conclude that the award of the contract to NAS was proper.

The relevant facts are as follows. The office of management information systems (OMIS) data center provides data processing services to State agencies from a computer installation in Boston. In 1987, the data center operated three computers: two Amdahl 5870's, each having a capacity of 21 MIPS (or millions of instructions per second),[4] and one International Business Machines Corporation (IBM) 3081K+, having a capacity of 15 MIPS. The Amdahl computers were operating at full capacity, while the IBM computer had only enough software and peripheral equipment to take advantage of 60% of its capacity, or 9 MIPS.

Each of the three computers ran as one "system image," in the terminology of the industry. To reflect its lower utilization, however, the data center staff referred to the IBM computer as having half a system image. Thus, the staff considered that the data center operated on two and one-half rather than on three system images.[5]

To plan for expansion of the center, OMIS's capacity planners prepared a report entitled "Two-Year Growth Plan for the OMIS Data Center." The plan projected the growth in data center services and presented an analysis of the options available for expanding the data center's capacity. The plan predicted that the Commonwealth's data processing needs in the fall of 1987 would be slightly more than 70 MIPS and that procurement of a new, more powerful processor in the 42-77 MIPS range would be more cost effective over a five year period than would procurement of an older technology, smaller, less expensive processor in the 21-26 MIPS range. According to the plan, acquiring a larger processor would enable the data center to reduce the number of system images it was operating to two, while acquiring smaller processors would increase the number of system images with their

Administration and Finance (EOAF). 801 Code Mass. Regs. §§ 5.00 et seq. (1987). See particularly § 5.03.

[3] The plaintiff does not challenge the regulatory scheme followed by the defendants. Nor does the plaintiff assert favoritism, bad faith, or arbitrary and capricious conduct in the awarding process.

[4] MIPS is one of the units used by the computer industry to measure mainframe computer capacity.

[5] For each system image, the agency must procure a separate software licensing package, for which the user must pay a fee. Each system image also requires its own complement of peripheral equipment, tape drives, networks, and personnel time. Thus, the more system images there are, the greater the costs associated with software licensing, maintenance, peripheral equipment, and personnel.

attendant costs (see note 5, *supra*). On the basis of the plan and other ongoing studies and analyses, OMIS issued an Invitation for Bids (IFB) on June 24, 1987. The IFB called for a one system image, IBM-compatible processor having 40-60 MIPS capacity, upgradeable by February 1, 1988, to at least 75 MIPS with one system image (later reduced to 73 MIPS by an amendment to the IFB).

On July 9, 1987, the Commonwealth received eleven bids, including two from NAS and six from Amdahl. One of the NAS bids offered a 57 MIPS processor at a cost of $7,275,950. One of Amdahl's bids offered a 42 MIPS processor at a cost of $5,091,643. Ranking the responsive bids by vendor cost using the formula described below, the selection board declared NAS's 57 MIPS bid the lowest and awarded NAS the contract.

Prior to issuing the IFB, the selection board had prepared and filed with the State purchasing agent an evaluation formula by which to rank bids according to vendor costs. See 801 Code Mass. Regs. §§ 5.03, 5.29, 5.35 et seq. As bids could not equitably be ranked on an absolute dollar basis because of the price range of different sized processors, the formula ranked bids on a cost per MIPS basis. Bids were assigned a credit or assessed a charge, depending upon the capacity of the computer offered.

1. *Credit calculation*: The formula applied a credit of $269,437 to bids offering a processor with more than 48 MIPS capacity, on the theory that procurement of such a processor would enable the data center to reduce more quickly the number of its system images to two, while achieving the projected demand of 70 MIPS by the fall of 1987. The credit of $269,437 consisted of two elements: a monthly savings figure of $139,888, and a one-time savings/cost avoidance figure of $129,549. The monthly figure was intended to reflect the reduction to two system images and the associated savings in software licensing fees, peripherals, and personnel time.[6] The one-time figure was intended to reflect the cost savings associated with the purchase of a new direct access storage device, or disk drive.

Amdahl attacks the assumptions underlying the evaluation formula as well as the mathematical results of the formula. Amdahl asserts that the formula contained at least two serious miscalculations which caused the selection board to misrank the two bids in issue in this case. The miscalculations, Amdahl claims, resulted in violations of the competitive bidding laws, as the contract was not awarded to the lowest responsible bidder.

We conclude that the credit component of the formula should have reflected only the monthly savings figure of $139,888, and not the one-time

---

[6] The selection board arrived at this figure by multiplying the projected monthly cost savings ($17,486) by eight, assuming that if the Commonwealth purchased a processor of 48 or fewer MIPS capacity, an upgrade would be installed eight months later, and, at that time, the number of the data center's system images could be reduced to two.

cost avoidance figure of $129,549.[7] In this respect we agree that the calculation of the credit element of the formula contained an error. As we shall see, however, the error does not turn out to be decisive.

2. *Charge (penalty) calculation*: To bids offering a processor with 48 or fewer MIPS capacity, a charge of $477,013 was applied. This charge was intended to represent both the costs associated with upgrading to full capacity the data center's existing IBM computer until the new processor could be upgraded, and the related costs of operating a third system until the upgrade of the new processor to 73 MIPS.[8] As with the credit component of the formula, the charge figure consisted of two elements: a monthly calculation of added costs and a one-time cost figure. The additional monthly costs were estimated to be $15,284 for eight months, or $122,272. This amount included the additional software licensing fees and personnel time needed to operate a third system image until the upgrade of the 48 or fewer MIPS processor projected to be eight months later. The one-time cost figure was calculated as $354,741. This figure included costs to purchase additional software, hardware and peripherals to bring the existing IBM computer up to full capacity during the eight months before the upgrade of the new processor.

The trial judge concluded that "[t]he reasons for the penalty are faulty." In reaching that conclusion, the judge overstepped his authority. In effect, the judge was attempting to dictate how OMIS should have planned to configure its existing computers in the event the Commonwealth procured a processor with 48 or fewer MIPS. By so doing, the judge impermissibly attempted to regulate internal agency functions. "Th[e trial] court is not empowered to direct an administrative board how to perform its public duties." *Berman* v. *Board of Registration in Medicine*, 355 Mass. 358, 360 (1969). A judge's authority is particularly limited where, as here, the matter is within the technical competence of the agency. See *Massachusetts Auto. Rating & Acc. Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 337 (1981).

We think that the judge could not properly conclude that the calculation of the charge in the evaluation formula was faulty. To the contrary, the evidence shows that the agency's plan was not unreasonable. The plan was

---

[7] At trial, the Director of OMIS and the assistant director of the bureau of systems policy and planning all but conceded that the calculation of this one-time cost avoidance was incorrect. The same savings would have been realized if the Commonwealth had purchased a processor with a 48 or fewer MIPS, albeit eight months later. Based upon this evidence, the trial judge properly could conclude, as he did, that the correct figure should have been the interest on the savings of $129,549 over eight months, not the full amount of the savings.

[8] At that time the data center would have sufficient capacity, between the new processor and one of the existing processors, to eliminate the third system image. As with the credit calculation, the charge calculation assumed that, if a processor with 48 or fewer MIPS were installed, a period of eight months would elapse before the agency installed the upgrade and began to realize the savings associated with operating two system images.

made after careful analysis and consideration of various options. OMIS justified its decision on the ground that it believed the data center could not operate for an extended period of time with a crippled machine. Furthermore, in evaluating whether to install the upgrade in the existing IBM computer, OMIS considered the cost of the upgrade and concluded that the cost was a small percentage of the purchase price and was small in comparison with the potential inconvenience and dissatisfaction of nearly 500 users of the IBM computer.

3. *The award of the contract.* It remains only to consider whether the erroneous addition of $129,549 in one-time cost savings to the credit figure had any substantive effect on the ranking of the two bids at issue here. Comparing the cost per MIPS of the two bids [9] ($132,587.04 for Amdahl's and $125,194.07 for NAS's) we conclude that the selection board did not err when it ranked NAS's bid ahead of Amdahl's.

4. *Other claims of error.* Amdahl attacks the charges and credits as a whole, claiming that they unfairly disadvantaged computers with 48 or fewer MIPS. Given the evidence in this case we cannot agree.[10] OMIS provided ample justification for applying a charge or a credit to the various bids depending upon the size of the computer offered. The purpose of the charges and credits was to allow the selection board to compare fairly the different sized machines. The charge reflected the additional costs associated with operating an additional system image. The credit (adjusted to take into account the error described above) reflected the savings associated with operating two system images.

Relying exclusively on the definition of "Invitation for Bids" in 801 Code Mass. Regs. § 5.03, which provides that an IFB is to be used when "the sole criterion for evaluation is cost," Amdahl also claims that the evaluation formula failed to rank bids according to their relative cost as required by the regulations. That argument is of no avail. See 801 Code Mass. Regs. §§ 5.29, 5.45. The evaluation formula ranked the bids according to the real economic cost to the data center of procuring the computer. As already explained above, the credits applied and the charges assessed in the evaluation formula were not only justified and reasonable, but also were

---

[9] Our mathematical calculation is as follows. As the Amdahl bid offered a computer with fewer than 49 MIPS processing power, we add the charge of $477,013 to the total bid calculation: $5,091,643 + $477,013 = $5,568,656. This figure is then divided by the number of MIPS ($5,568,656/42), resulting in a cost per MIPS figure of $132,587.04. NAS's bid offered a computer with 57 MIPS. Thus, we subtract the credit (adjusted to reflect the error in the calculation of the one-time cost savings) of $139,888 from the bid price: $7,275,950 − $139,888 = $7,136.062. When that figure is divided by the number of MIPS ($7,136,062/57), we arrive at a cost per MIPS figure of $125,194.07. Our calculation does not reflect adjustments to the credit and charge amounts which were included in addenda to the briefs.

[10] We note that Amdahl's bid was lower than IBM's three bids for computers having more than 49 MIPS processing power. That fact refutes the assertion that the evaluation formula treated unfairly bids offering computers with fewer than 49 MIPS so that such computers had little if any chance of winning the contract.

necessary to assess fairly the real cost to the data center of procuring various sized computers.

With respect to the above conclusions, we think that the selection board evaluated all bids on a "common footing," as required by the case law. See *Interstate Engr. Corp.* v. *Fitchburg*, 367 Mass. 751, 757-758 (1975); *Datatrol Inc.* v. *State Purchasing Agent*, 379 Mass. 679, 699 (1980); *Department of Labor and Indus.* v. *Boston Water and Sewer Commn.*, 18 Mass. App. Ct. 621, 626 (1984). The bidders had an opportunity to bid in the same way, on the same information, and to bear the same risk of rejection. Fairness and equality were preserved since the board applied the evaluation formula to all the bids submitted in a neutral and equitable manner. *Ibid.*

The board has not been shown to have violated any regulation or statute in the ranking of bids or the awarding of the contract to NAS. Compare *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Authy.*, 387 Mass. 687, 691 (1982). Nor was the error in the evaluation formula made in bad faith. Compare *Roblin Hope Indus. Inc.* v. *J.A. Sullivan Corp.*, 6 Mass. App. Ct. 481, 490-491 (1978); *Bradford & Bigelow, Inc.* v. *Commonwealth*, 24 Mass. App. Ct. 349, 359 (1987).

The judge declined to declare the contract void on the ground that, following award, Amdahl, as a disappointed bidder, was limited to its bid preparation costs. See and compare *Paul Sardella Constr. Co.* v. *Braintree Housing Authy.*, 3 Mass. App. Ct. 326 (1975), *S.C.* 371 Mass. 235 (1976). We need not decide whether the *Sardella* principle is applicable in circumstances — as here — where payment by the public authority has been enjoined and when the vendor has proceeded at its risk. We have decided that the award is sound and that for that reason the judgment is to be affirmed.[11]

*So ordered.*

*Donald R. Ware* (*Joseph D. Halpern* with him) for the plaintiff.

*Gerald K. Kelley,* Assistant Attorney General (*David Thomas,* Special Assistant Attorney General, with him) for Bureau of Systems Policy and Planning & others.

*Douglas C. Moxham* (*Howard A. Brick* with him) for National Advanced Systems Corporation.

---

[11] No challenge has been made to the trial judge's award to Amdahl of bid preparation costs. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 919 (1975).