E. Amanti & Sons, Inc. *v.* R.C. Griffin, Inc.; Town of Danvers.

E. Amanti & Sons, Inc. *vs.* R.C. Griffin, Inc., & another[1]; Town of Danvers, third-party defendant.

No. 98-P-855.

Essex. January 12, 2000. - November 21, 2001.

Present: Jacobs, Gillerman, & Beck, JJ.

*Contract,* Public works, Bidding for contract, Subcontract, Specifications, Damages, Indemnity. *Public Works,* Bidding procedure, General contractor, Specifications, Attorney's fees. *Damages,* Loss of profits, Attorney's fees, Public works contract.

Discussion of the construction and legislative history of G. L. c. 30, § 39M(*b*), governing specifications in public construction contracts. [250-252]

Bid specifications for an exhaust system for a fire station in the town of Danvers that failed to communicate clearly to prospective bidders the terms of the specifications, that is, a listing of acceptable sources of materials for a competitive bid or a clear indication that the specifications were proprietary, violated the provisions of G. L. c. 30, § 39M(*b*). [252-253]

In a damages assessment hearing following the civil trial of a complaint brought by a subcontractor against a general contractor regarding a public works project for the town of Danvers, in which trial the subcontractor had been awarded damages, interest, attorney's fees, and court costs, the judge did not err, in the circumstances, in requiring the town, on the general contractor's third-party complaint against it, to reimburse the general contractor for the damages the contractor had been ordered to pay [253-257]; however, on appeal, the general contractor failed to demonstrate any ground on which it was entitled to recover its own attorney's fees and costs against the town [257-258].

Civil action commenced in the Superior Court Department on September 18, 1995.

The case was heard by *Christine M. McEvoy,* J., on motions for summary judgment, and a hearing on an assessment of damages was had before *Nancy Merrick,* J.

*Brad A. Gordon* for town of Danvers.

*John J. Spignesi* for the plaintiff.

[1]Fidelity & Deposit Co. of Maryland.

*Peter W. Waltonen* for R.C. Griffin, Inc., & another.

BECK, J. This dispute concerns the specifications for the emergency vehicle exhaust system for a fire station in the town of Danvers. The plaintiff, E. Amanti and Sons, Inc. (Amanti), the successful heating, ventilation, and air conditioning (HVAC) subbidder, claims that the town's interpretation of the specifications violated key provisions of G. L. c. 30, § 39M(*b*). Having no privity with the town, Amanti brought suit against R.C. Griffin, Inc., the general contractor, and its surety, Fidelity & Deposit Co. of Maryland (general contractor). Amanti's complaint sought payment from the general contractor for excess costs Amanti incurred when the general contractor, at the insistence of the town, required Amanti to supply a specific emergency vehicle exhaust system that was more costly than the one Amanti had bid. The general contractor then filed a third-party action against the town for any damages Amanti might recover from it. A Superior Court judge allowed summary judgment for Amanti against the general contractor and for the general contractor against the town. The town appeals. The general contractor also appeals, claiming it is entitled to recover the attorney's fees and costs it incurred in this litigation. We affirm the order on assessment of damages and the judgment which were entered on November 21, 1997.

1. *Procedural and factual background.* The specifications at issue here were set out in a five and one-half page addendum to the invitation for bids for construction of the town's new fire station. (There is nothing in the record concerning the specifications the addendum "replace[d]." ) The specifications required the emergency vehicle exhaust system to be "the standard product of a U.S. exhaust system manufacturer" and consisted of eighteen detailed paragraphs. Paragraph 18 reads as follows:

> "Emergency Vehicle Exhaust System shall be as specified and manufactured by PlymoVent, or approved equal by the Fire Department."

Amanti, a Massachusetts corporation experienced in the relevant subtrade as well as in public sector work, submitted a subbid for the HVAC system. See G. L. c. 149, § 44F. After the town awarded the contract to the general contractor, which had

carried Amanti as its HVAC subbidder, Amanti sought approval for a proposed emergency vehicle exhaust system manufactured by Carmon. Initially, the town's architect agreed.

Shortly thereafter, however, the architect notified the general contractor that Amanti's proposed exhaust system did not meet the "performance requirement" in the addendum. The letter set out specific failings of Amanti's proposed system, required Amanti to "resubmit a revised vehicle exhaust system" meeting the town's specifications, and noted:

> "The Fire Department has researched and observed in operation a number of exhaust systems. Their requirements were used in preparing the specification. The performance and characteristics included in the specification are provided so as not to limit the system to a single manufacturer."

Amanti responded by reminding the general contractor that the project was bid under G. L. c. 30, § 39M, that for a competitive bid the statute required the awarding authority to provide three named brands or a description that can be met by a minimum of three manufacturers, and that "[w]ithout such provision a specification for a product becomes proprietary." Amanti asserted that the town had failed to follow the steps necessary to "limit the acceptable [v]ehicle [e]xhaust system to a single supplier." Amanti therefore requested that it "be furnished the name[s] and specific model number(s) of two additional manufacturers which are equivalent and therefore will be accepted in order that we may solicit competitive quotations."

In response, the architect insisted that it had "provide[d] a performance type of specification . . . [and] the name of one manufacturer that . . . meets the performance requirements [while indicating it] would accept other manufacturers who [could] meet [those] criteria." The architect's letter directed the general contractor to submit shop drawings within two weeks and stated that failure to do so would constitute a default. Four days later, presumably in response to Amanti's request, the architect wrote another letter to the general contractor which stated, "I have the names of suppliers of vehicle exhaust systems such as Tycon, Monoxivent and N.S.G.V. but I don't know where they are located, I can't get any technical materials

and I don't know if their standard package includes the [three] essential safety features we specified." Amanti then notified the general contractor that it would furnish the PlymoVent system, but under protest, and would seek full compensation for additional costs. Eight months later, apparently after completing the project, Amanti filed this action.

There being no privity between the subcontractor and the town, see *Grande & Son* v. *School Hous. Comm. of N. Reading*, 334 Mass. 252, 255-256 (1956), Amanti brought suit against the general contractor under G. L. c. 149, § 29. Asserting that the town's demands violated G. L. c. 30, § 39M(*b*), Amanti claimed it was entitled to recover the additional costs of the PlymoVent system ($18,588.11), plus interest, costs, and reasonable attorney's fees. The general contractor answered, denying liability, and filed a third-party complaint against the town seeking "the full amount ultimately adjudged due Amanti plus interest, costs and attorneys fees." Upon motions for summary judgment — Amanti against the general contractor, the general contractor against the town, and the town against the general contractor — a Superior Court judge allowed the motions of Amanti and the general contractor and denied the town's motion. A different judge held a damages hearing and awarded damages to Amanti and to the general contractor to the extent that it was liable to Amanti. The town and the general contractor appeal, the latter claiming entitlement to attorney's fees and costs it incurred in litigating Amanti's claim.

2. *The applicable law.* At the time of the events in this case, G. L. c. 30, § 39M(*b*), as amended by St. 1967, c. 535, § 5, provided:

> "Specifications for such contracts [under G. L. c. 30, § 39M(*a*)], and specifications of contracts awarded pursuant to the provisions of [G. L. c. 149, §§ 44A to 44L] shall be written to provide for full competition for each item of material to be furnished under the contract; except, however, that said specifications may be otherwise written for sound reasons in the public interest stated in writing in the public records of the awarding authority or promptly given in writing by the awarding authority to anyone making a written request therefor, in either instance such writ-

ing to be prepared after reasonable investigation. Every such contract shall provide that an item equal to that named or described in the said specifications may be furnished; and an item shall be considered equal to the item so named or described if (1) it is at least equal in quality, durability, appearance, strength and design, (2) it will perform at least equally the function imposed by the general design for the public work being contracted for or the material being purchased, and (3) it conforms substantially, even with deviations, to the detailed requirements for the item in the said specifications. For each item of material the specifications shall provide for either a minimum of three named brands of material or a description of material which can be met by a minimum of three manufacturers or producers, and for the equal of any one of said named or described materials."

(The term "material" was defined as an "article, assembly, system, or any component part thereof." G. L. c. 30, § 39M[*e*], as appearing in St. 1963, c. 842, § 1.) We discuss the statute in more detail below.

3. *Standard of review, prior proceedings, and issues on appeal.* "The standard for reviewing . . . [trial court action on] a motion for summary judgment is whether the record shows that there is no genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). . . . [S]tatutory interpretation is a question of law for the court to decide." *Annese Elec. Servs., Inc.* v. *Newton*, 431 Mass. 763, 764 n.2 (2000) (citation omitted).

The Superior Court judge ruled in relevant part that, despite the town's insistence to the contrary, "[the town's] exhaust system specification [was] not a performance [i.e. competitive] specification because . . . [it was not] able to be satisfied by any manufacturer other than PlymoVent." She concluded that the town "had a duty to disclose to bidders that PlymoVent was [a] sole source" and that having failed in that duty, the town was liable for Amanti's lost profits.

On appeal, the town contends that its "bid specifications were compliant [with] the terms of c. 30, § 39M(*b*)." According to the town, "the plain language of the statute does not

prohibit project specifications from occupying a middle ground between the two ends of the spectrum: specifications that allow for full competition and those that are proprietary." It argues that its reference to a PlymoVent system did not constitute a sole source because the specifications "did not explicitly limit the HVAC contractor to only one source." Instead they allowed the subcontractor to substitute a system equal to PlymoVent "if the subcontractor could uncover one after its own investigation." Curiously, the town argues that "for purposes of this dispute, it is irrelevant whether these specifications are characterized as 'full competition' or as 'proprietary.' In either case, the Town is entitled to receive equipment which is in conformity to the specifications, for the amount bid by Amanti."

Needless to say, Amanti's view of the statute and its application to the facts of this case is different. Amanti argues that "[t]hrough its express language and by its operation [G. L.] c. 30, § 39M(*b*), has transformed the phrase 'or equal' into a term of art in the field of competitive bidding." According to Amanti, these words signify "that at least three manufacturers are known to be acceptable to the awarding authority for the specified product." (The authority for this point is the affidavit of Amanti's president.) Pointing to the evidence, including the town's answers to interrogatories, that the town had found no system other than PlymoVent that satisfied its specifications, Amanti argues the town was misleading when it insisted that the specifications did not limit the system to a single manufacturer.

4. *Legal analysis.* We reject the town's argument that the nature of the specifications does not matter. The point of enacting § 39M(*b*) was to establish competition as the rule in awarding public construction contracts while providing for limited exceptions. "[T]he legislative goals . . . [were] to create an open and honest competition [in public construction projects] with all bidders on an equal footing . . . [and] to obtain the lowest eligible bidder," *Petricca Constr. Co.* v. *Commonwealth,* 37 Mass. App. Ct. 392, 396 (1994), thus "reduc[ing] opportunities for corruption, favoritism, and political influence in the award and administration of public contracts." *Modern Continental Constr. Co.* v. *Lowell,* 391 Mass. 829, 831 n.5

(1984), quoting from St. 1980, c. 579, § 55. See *Modern Continental Constr. Co.*, *supra* at 832 n.6; *Commonwealth* v. *Johnson Insulation*, 425 Mass. 650, 654 (1997).

In order to determine what § 39M(*b*) requires for specifications, we look first to the words of the statute. *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 420 (1986). In order, the terms of the statute are as follows. First, the statute establishes the general rule that all specifications in public construction contracts must provide for full competition; then it provides for an exception for specifications that may be "otherwise written" if there are "sound reasons in the public interest." It requires that "[e]very such contract" must provide that an item "equal to" a given item may be substituted and sets out the factors necessary to demonstrate that the item is equal to the named item. Finally, specifications "[f]or each item of material" must provide at least three named brands or a description that at least three manufacturers can supply "and for the equal of any of the said named or described materials."

Unfortunately there are several ambiguities in § 39M(*b*), in part stemming from the fact that nowhere does the statute use the terms proprietary, sole source, or performance to modify the word specifications, as those active in the industry apparently do. (Without analyzing whether these terms are in fact interchangeable [we have found no law on the subject], for the purposes of this decision we shall use the terms "competitive specifications" and "proprietary specifications" to describe the different approaches.) Nor is there a clear antecedent for the words "such contract" when it appears in the second sentence. The significance of the repetitive reference to the substitution of an "equal" item of material is unclear as well. We therefore turn to the legislative history and other tools of statutory construction. See *Barclay* v. *DeVeau*, 384 Mass. 676, 680 (1981). See also *Annese Elec. Servs., Inc.* v. *Newton*, 431 Mass. at 767 (competitive bidding statute construed in light of legislative objectives). On the facts of this case, it is not necessary that we resolve all ambiguities.

As originally enacted, G. L. c. 30, § 39M(*b*), ended after clause (3) in the second sentence. St. 1963, c. 842. Although in its initial form the statute placed the highest priority on achiev-

ing full competition, there was relatively little guidance for drafting appropriate specifications. Four years later, the Legislature added a final sentence to § 39M(*b*). It provided:

> "For each item of material the specifications shall provide for either a minimum of three named brands of material or a description of material which can be met by a minimum of three manufacturers or producers, and for the equal of any one of said named or described materials."

St. 1967, c. 535, § 5. The 1967 amendment described the requirements for competitive specifications that had been missing before. It required the awarding authority to demonstrate that there are at least three sources from which a bidder could obtain essential items for the project. The amendment also made clear that both proprietary specifications (those that are "otherwise written") and competitive specifications must allow substitution of a product deemed to be equal to those named or described in the specifications.

It is unclear precisely what action an awarding authority must take to ensure that proprietary specifications comply with § 39M(*b*). Conducting an investigation (which the town apparently did here) and writing a report in the public record (of which there is no evidence) or responding in writing to written requests are necessary. However, these provisions do not satisfy the legislative objectives because they do not ensure that the information reaches the bidder. (The town asserts, without reference to the record, that it set forth "the policy reasons in support of the specifications . . . on at least two occasions.") Placing the burden on bidders to make a written request for such a report, as the town argues Amanti failed to do, is not an appropriate solution. See *Modern Continental Constr. Co.* v. *Lowell*, 391 Mass. at 836 (bidder's failure to question the awarding authority not basis for estoppel defense). It is the awarding authority's burden to communicate clearly to prospective bidders the terms of the specifications.

Nor is it the bidder's responsibility to, in the town's word, "uncover" three sources for materials subject to a competitive bid, although it is the bidder's responsibility to locate an "equal" product. See St. 2000, c. 159, § 62 (recent amendment to § 39M[*b*] adding language making clear that the determina-

tion of whether an item is equal to one named in a specification is "in the opinion of the awarding authority").

Here it is clear at least from the post-award correspondence and the town's answers to interrogatories that, as the Superior Court judge found, the town's specifications were proprietary, despite its persistent denial. A critical aspect of open and honest competition is that all participants should have complete and accurate information about the terms of the procurement, either a listing of acceptable sources of materials for a competitive bid or a clear indication that the specifications are proprietary. The mere addition of the words "or equal" to the designation of PlymoVent, which are required in any case, did not constitute a middle ground, as the town suggests, or otherwise satisfy the requirements of § 39M(*b*). (The town's explanation may hark back to the bidding habits that prompted the 1967 amendment which spells out the terms of a competitive bid.)

In its brief, the town relies on a decision of the office of the Attorney General, see G. L. c. 149, § 44H, in a case involving the town of Lexington. Even if the decision had precedential value, which it does not, see *Annese Elec. Servs., Inc.* v. *Newton*, 431 Mass. at 771, it supports the Superior Court judge's decision here. Although Lexington also required an emergency vehicle exhaust system "as specified and manufactured by PlymoVent or approved equal," it explicitly informed prospective bidders that "[a] letter discussing PlymoVent as a *sole source vendor* pursuant to [G. L. c. 30, § 39M], has been filed with the Awarding Authority" (emphasis added). As discussed above, that is exactly the point. Providing the name of a single vendor and placing the burden on the bidder to discover alternatives did not constitute competitive specifications.

5. *Damages.* While acknowledging the general rule that "strict adherence to the public bidding laws overrides equitable considerations," the Superior Court judge rejected the town's assertion that the plaintiff was not entitled to damages. She determined that the town had not entered a "no bid" contract and that "[t]o allow [the town] the double benefit of obtaining the PlymoVent emergency vehicle exhaust system and voiding the contract so that it will not have to indemnify [the general contractor] for Amanti's loss because of [the town's] wrongful

conduct is unjust." Finding that the town's conduct was "commensurate with bad faith," she decided that "the measure of damages for Amanti" was lost profits, citing *Peabody Constr. Co.* v. *Boston*, 28 Mass. App. Ct. 100, 105-106 (1989) (affirming the denial of preliminary injunctive relief to disappointed bidder and noting that plaintiff would be able to recover lost profits if it prevailed at trial).

On appeal, the town relies on *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Authy.*, 387 Mass. 687, 693 (1982), and *Majestic Radiator Enclosure Co.* v. *County Commrs. of Middlesex*, 397 Mass. 1002, 1003 (1986), to support its argument that the general contractor is not entitled to damages. It argues that a "contract created in violation of the competitive bidding laws is invalid and unenforceable." Quoting from *Majestic Radiator, supra* at 1003, the town asserts that "failure to follow the bidding procedure in *any* respect is *fatal*" (emphasis in town's brief).

The town is correct that the general rule focuses on the statutory goal of competitive bidding for public procurement contracts rather than on the equities of a particular bidding situation. See *Phipps Prods. Corp., supra* at 691. There is precedent, however, for requiring a city to pay a subbidder the extra costs of installing plumbing pipes described in the specifications. *E.A. Berman Co.* v. *Marlborough*, 11 Mass. App. Ct. 1009 (1981). In that case, a rescript relying on documentary evidence not otherwise described, we concluded that other bidders could have run the same risk of bidding the less expensive pipe and that the plaintiff did not act wrongfully or to the disadvantage of other subbidders. *Id.* at 1010.

Moreover, the cases the town cites are distinguishable. *Phipps Prods. Corp., supra*, involved a complaint for specific performance of a purchase and sale agreement where the Massachusetts Bay Transit Authority (MBTA) had reneged on the agreement. The MBTA had negotiated the sale without an advertisement of its intent to sell the property. Without such an advertisement, there was no basis for determining the highest bidder, as G. L. c. 161A, § 5(*b*), requires. The bid in question was submitted more than a year after the deadline for an earlier unsuccessful public bidding process. The Supreme Judicial

Court held that "in order to fulfil the public purpose of § 5(*b*), the agreement [was] not enforceable against the MBTA." *Phipps Prods. Corp.*, *supra* at 692.

In *Majestic Radiator*, *supra*, the president of the company solicited business from the Middlesex County Hospital. Ultimately the company supplied 293 radiator covers in a no bid contract, supposedly based on an emergency waiver. When the county treasurer refused to pay the bill, the company brought suit. The court held that the company could not recover. Not only was there no competitive bid, but there was also a failure to comply with the statutory emergency procedures. It was that failure that the court determined to be fatal, even in the absence of bad faith. 397 Mass. at 1004. Thus, both *Phipps* and *Majestic* involved what were essentially no bid contracts, one involving real property and the other radiator covers.

Most suits claiming that contracts made in violation of bidding laws are void have been brought by disappointed bidders or by taxpayers challenging the award of the contract pursuant to G. L. c. 40, § 53. These challenges involve contracts that had yet to be performed. See, e.g., *Gifford* v. *Commissioner of Pub. Health*, 328 Mass. 608 (1952) (taxpayer challenge to award of contract to general contractor whose bid did not accurately reflect actual subbids); *East Side Constr. Co.* v. *Adams*, 329 Mass. 347 (1952) (taxpayer challenge to award of contract to general contractor whose bid omitted required demolition work); *Grande & Son* v. *School Hous. Comm. of N. Reading*, 334 Mass. 252 (1956) (disappointed bidder challenged award to contractor whose bid included subbid for acoustical tile that did not comply with town's specifications); *Interstate Engr. Corp.* v. *Fitchburg*, 367 Mass. 751 (1975) (disappointed bidder challenged award to contractor whose bid included artificially low subbid); *Datatrol Inc.* v. *State Purchasing Agent*, 379 Mass. 679 (1980) (disappointed bidder challenged use of problem solving bid specification not authorized under statute). Here, by contrast, as the Superior Court judge pointed out, an awarding authority seeks to avoid payment for work performed following a competitive bidding process.

There are "circumstances in which noncompliance with bidding requirements has been characterized as technical rather

than substantive, as a minor deviation not requiring invalidation of a bid or a contract." *Phipps Prods. Corp.*, 387 Mass. at 692. See *Cataldo Ambulance Serv., Inc.* v. *Chelsea*, 43 Mass. App. Ct. 26, 31 n.11 (1977). This is not such a case. We must therefore consider "whether invalidation is necessary in order to fulfil the legislative purpose [of § 39M(*b*)]." *Phipps Prods. Corp.*, 387 Mass. at 692.

"[T]he legislative goals of § 39M are two-fold. First, to create an open and honest competition with all bidders on an equal footing . . . . Second, § 39M enables the public contracting authority to obtain the lowest eligible bidder." *Petricca Constr. Co.* v. *Commonwealth*, 37 Mass. App. Ct. at 396 (citation omitted). There is nothing in the record before us suggesting that the emergency vehicle exhaust system specifications in general or Amanti's initial choice of Carmon influenced the selection of the general contractor or disadvantaged any of the bidders. Cf. *Amdahl Corp.* v. *Bureau of Sys. Policy & Planning*, 26 Mass. App. Ct. 991, 993-996 (1988) (error in calculation of credit element in procurement not decisive). Nor is there any evidence that the awarding authority did not obtain the lowest bid. The fire chief, in his second affidavit, avers that Amanti was the low HVAC subbidder and that the second lowest subbidder was $3,700 higher. Nothing is made of this fact, nor could it be, since bidding statutes requiring selection of the lowest responsible bidder do not require selection of the lowest responsible subbidder. *East Side Constr. Co.* v. *Adams*, 329 Mass. at 353-354. *Interstate Engr. Corp.* v. *Fitchburg*, 367 Mass. at 763 (Wilkins, J., dissenting). There is simply nothing before us to suggest that these specifications upset "the equal footing principle." *Petricca Constr. Co.* v. *Commonwealth*, 37 Mass. App. Ct. at 397.

We have found only two cases in which a contractor was denied recovery after having fully performed. In each of those, involving the purchase of goods rather than construction of a building, the parties circumvented the competitive bidding process altogether. See *Adalian Bros.* v. *Boston*, 323 Mass. 629 (1949) (rugs for the mayor's office); *Majestic Radiator, supra* (radiator covers). Such is not the case here. Cf. *East Side Constr. Co.* v. *Commonwealth*, 329 Mass. at 353 (taxpayer suit holding

that contract not lawfully awarded, but not addressing work allegedly already performed).

Therefore, in the circumstances of this case and on the record and argument before us, we conclude that the judge did not err in requiring the town to reimburse the general contractor for the damages the contractor was ordered to pay Amanti. We do not, however, endorse the basis of the judge's decision — bad faith on the part of the town. See *Schwartz* v. *Travelers Indemnity Co.*, 50 Mass. App. Ct. 672, 673 (2001) (appellate court may affirm for different reasons). Bad faith is a question of fact, as to which the judge appears to have made no subsidiary findings. See *Foster* v. *Bowen*, 311 Mass. 359, 364 (1942). In any event, "[a]bsence of bad faith . . . does not excuse noncompliance with the procedure established by the Legislature . . . ." *Gifford* v. *Commissioner of Pub. Health*, 328 Mass. at 617.

6. *Attorney's fees.* After a damages hearing, a second Superior Court judge ordered that Amanti recover of the general contractor $18,588.11 (the additional cost of the PlymoVent equipment), with interest, together with $5,981 in attorney's fees, and court costs of $217.52. See G. L. c. 149, § 29; *Campbell Hardware, Inc.* v. *R.W. Granger & Sons*, 401 Mass. 278, 279-280 (1987). The court further ordered that the general contractor recover of the town "any damages assessed against [the general contractor] in this matter in favor of E. Amanti & Sons, Inc."

On appeal, the general contractor argues that it "should be able to recover [its] own attorney's fees and interest and costs against [the town] as a pass through under [G. L. c. 149,] § 29." The general contractor acknowledges, however, that "current law does not provide for such pass through." It claims it is entitled to recover these expenses under the "theory" of breach of contract, compare *Campbell Hardware, Inc.* v. *R.W. Granger & Sons*, 401 Mass. at 280, and argues that leaving it to bear its own costs is inequitable, since the general contractor was a party only because there was no privity between the town and Amanti.

This issue was not squarely raised in the proceedings below. It is at best unclear whether the general contractor requested this relief in its third-party complaint. While prior to the hearing

on damages, the general contractor filed an affidavit on its attorney's fees, the judge did not address this issue either in her order for damages or in the judgment on damages. The general contractor did not move for reconsideration to obtain a ruling on this point.

In any case, as the general contractor acknowledges, the law does not authorize the relief it seeks. Under the "American Rule," litigants bear their own expenses unless a statute or a contract or other agreement provides otherwise. *Judge Rotenberg Educ. Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation (No. 1)*, 424 Mass. 430, 468 (1997). Such is not the case here. There is nothing in the record to suggest an express agreement between the town and the general contractor that the town would indemnify the general contractor. Nor are there any "special factors" that would lead to an implied right to indemnification. See *Fall River Hous. Authy.* v. *H.V. Collins Co.*, 414 Mass. 10, 14 (1992); *Araujo* v. *Woods Hole, Martha's Vineyard, Nantucket S.S. Authy.*, 693 F.2d 1, 2 (1st Cir. 1982) (setting out three circumstances which may give rise to indemnification: express agreement, right implied from special circumstances in the relationship, tort-based right where great disparity in fault). Contrast *Elias* v. *Unisys Corp.*, 410 Mass. 479 (1991) (addressing indemnification in tort cases).

Amanti, having requested in its brief attorney's fees "in connection with the appeal as provided by G. L. c. 149, § 29," may "submit [a] petition for fees together with the necessary back-up material and details as to hours spent, precise nature of the work, and fees requested," *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 20 (1989), within twenty days of the entry of the rescript in this case. The general contractor shall have twenty days to respond to such submission. *Ibid.*

*Order on assessment of damages and judgment affirmed.*