BRADFORD & BIGELOW, INC. *vs*. COMMONWEALTH.

Suffolk. February 17, 1987. — June 22, 1987.

Present: GREANEY, C.J., CUTTER, & FINE, JJ.

*Commonwealth,* Contracts, Purchasing, Claim against. *Contract,* Bidding for contract. *Damages,* Lost profits, Failure to award public works contract. *Practice, Civil,* Motion in limine.

On the Commonwealth's appeal from a judgment against it arising out of a dispute with respect to the award of a printing contract, a qualified low bidder was held to be entitled to its lost profits upon adequate proof that agencies or officers of the Commonwealth in bad faith set aside the award of the contract to it. [359]

Whether State action was arbitrary and capricious, or taken in bad faith, in the setting aside of a contract awarded under G. L. c. 5, § 1, was to be considered in light of the actions of not only the contracting officer but also all the Commonwealth officers and agencies on behalf of whom the contract award was made. [359-360]

Evidence presented at the trial of an action arising from a State agency's setting aside the award of a printing contract to a qualified low bidder, and the permissible inferences therefrom, warranted submission of the case to the jury on the issue whether the State action was arbitrary and capricious or taken in bad faith. [360-361]

In an action seeking damages for the Commonwealth's unlawful recission of a contract award, where the jury awarded as damages not only bid preparation costs on a finding of arbitrary and capricious conduct, but also lost profits for bad faith conduct, the two awards by the jury were duplicative and the judgment was to be modified to limit the plaintiff's recovery to the amount of its lost profits. [361]

CIVIL ACTION commenced in the Superior Court Department on September 8, 1983.

The case was heard by *Robert L. Steadman,* J.

*Brison S. Shipley,* Assistant Attorney General, for the Commonwealth.

*Neil Jacobs (Christopher J. Perry* with him) for the plaintiff.

CUTTER, J. This is an appeal by officers or agencies of the Commonwealth (defendant) from a judgment of the Superior Court in favor of Bradford & Bigelow, Inc. (B & B), arising out of a dispute with respect to the award of a contract for printing the ballots for the 1984 State elections. We set out the circumstances leading to the litigation based on the evidence at trial.

### Background of this Litigation

In May, 1983, the office of the State Purchasing Agent (SPA),[1] requested bids for printing the ballots to be used in the 1984 election. B & B, with its plant and principal office in Danvers, Essex County, was one of eight printing companies invited to bid. On June 15, 1983, two bids only were received. B & B submitted a bid of $1.5 million. Acme Printing Company (Acme), which had been awarded the next prior ballot contract, made a bid of $2.8 million.

In 1973, the Department of Labor and Industries (DLI) had certified B & B as paying the "prevailing rate of wages" in Danvers.[2] B & B remained thus certified until after its bids of June 15, 1983, had been submitted. It had performed each year from 1980 to 1983 approximately $100,000 of work for

---

[1] SPA, a division of the Executive Office for Administration and Finance, is responsible for awarding State printing contracts. See G. L. c. 5, § 1; c. 7, §§ 4A, 22. Under c. 5, § 1, contracts for State printing "shall be given to such establishments only as pay the prevailing rate of wages, based on wage rates and working hours that have been established by collective bargaining agreement or understanding between organized labor and employers. . . . *Said commission [of administration and finance], or other awarding official, may reject any and all bids received*" (emphasis supplied). Section 5 further provides, "The prevailing rate of wages shall be determined by the commissioner of labor and industries" in a manner to meet the standard set out above.

[2] There was testimony from the Commissioner of Labor and Industries at trial that DLI establishes "prevailing rates" for most urban centers in the Commonwealth (and the surrounding area of each) on the basis of local conditions and wages. DLI also maintains a list of approved vendors who pay such prevailing wages. The prevailing rate certified by Inspector Frederick Arsenault of DLI on May 10, 1973, could be found to have been based on local conditions in Danvers and to have been significantly lower than the "prevailing rate" then applicable to Boston.

the State despite the fact that a new ownership had taken over B & B in August, 1980.

On June 27, 1983, representatives of the office of the State Secretary (the Secretary) inspected B & B's plant in Danvers to determine whether B & B had the facilities essential to performing the 1984 ballot contract. During this meeting Robert Williams, Deputy State Secretary (designated by the Secretary to supervise work on the 1984 ballot contract), asked John Galligan, after 1980 the owner of B & B, whether B & B was paying the "prevailing rate." Galligan replied that B & B had been on the State eligible list for ten years. At the end of the meeting Williams told Galligan that the Secretary would advise SPA to award the contract to B & B.

Williams caused inquiry to be made of the inspector in charge of DLI's enforcement section whether B & B was an approved vendor and was told B & B was "paying the prevailing rate of wages." On July 12, the Secretary recommended to the SPA that the award be given to B & B because "the best interests of the Commonwealth would be served . . . by an award to" B & B. SPA then transmitted to B & B the proposed ballot contract, to be dated July 21, 1983.[3] B & B began actual performance of the contract by meeting with Williams to set up arrangement for telecommunications equipment.

Edward Canzano, Jr., president of Acme (the higher bidder), after learning of B & B's low bid, by a letter to the Secretary, dated June 21, 1983, raised questions concerning B & B's capacity to perform the contract and requested that DLI determine whether B & B was paying "the prevailing rate" of wages as required by G. L. c. 5, § 1. On June 22, 1983, before this letter was received by the Secretary's office, Acme's general manager, one Farraher, met at Acme's plant with Frederick L. Arsenault, then about to retire after thiry-one years as an inspector at DLI, during twenty-seven of which he had been in charge of determining prevailing wage rates in the printing

---

[3] The actual signing of the contract was delayed to permit a signing ceremony when the Secretary (then on a trip) returned to the Commonwealth. This was to publicize the savings to be effected by the award to B & B.

industry.[4] After his meeting with Farraher (and also with Canzano as he was leaving Acme's plant), Arsenault went to Danvers to B & B's plant.

Arsenault by a letter to B & B, dated June 24, 1983, mentioned that, during his visit on June 22, he had discovered B & B was under new ownership and that a record search revealed that no payroll review had been made by DLI since May, 1973. He requested, in order to bring DLI's records up to date, that B & B submit a complete recent payroll in some detail.

On July 22, Arsenault wrote to the SPA that B & B was disqualified from performing State printing contracts because it was "not paying the prevailing rates of wages."[5] This letter was accompanied by a list which showed that Arsenault and DLI had used, as a basis of determining the prevailing wage rates for printers in Danvers, the rates used by the Graphic Arts International Union (GAIU) in its contract negotiated for Boston. Galligan of B & B contended that this standard had never been applied by DLI to B & B in Danvers, where in 1983 GAIU did not represent any printing employees in Danvers or on the North Shore.

This situation was the subject of immediate discussion at various conferences or telephone talks involving two or more of Galligan, Arsenault (both before and after his retirement at

---

[4] Arsenault had inspected B & B in 1973 and had then certified that B & B was "in compliance" with G. L. c. 5, § 1. One reason advanced for the visits on June 22, 1983, was that they were to train Arsenault's successor and to have him see Acme's and B & B's plants. Arsenault at trial testified that, when he visited B & B on June 22, he already had learned from Acme that morning of B & B's bid on the ballot contract (despite an earlier contrary statement at his deposition). He denied, however, that he had discussed the ballot contract with Farraher and Canzano.

[5] A letter, dated August 16, 1983, from the senior counsel of DLI to Galligan of B & B attempted to explain this action as follows: "As of June 22, 1983 this Department had no knowledge that the ownership of Bradford and Bigelow had changed. On July 22, upon receipt of this knowledge, a routine inspection was undertaken to determine whether . . . the company was in compliance with the prevailing wage rates. A copy of your certified payroll shows that you are not. Consequently you may not bid on State printing projects until you request, in writing, to be reinstated and an investigation by our Department reveals that you are in compliance with the law."

the end of July, 1983), Daniel Carter (the SPA), Deputy Secretary Williams, and George W. Ripley, who took office as Commissioner of Labor and Industries on August 1, 1983. During these discussions, Arsenault somewhat inflexibly took the position that the Boston wage rates negotiated by GAIU had always been the standard applied to Danvers and Essex County and that the Boston GAIU rate was "the only rate" DLI was going to use in Danvers. Galligan, on the contrary, asserted that B & B had never paid rates as high as the Boston GAIU rates, even when first certified by Arsenault in 1973, and that B & B's 1983 payroll rates (when compared with any union or nonunion print shop on the North Shore) were then the highest in the area.

On July 29, 1983, Galligan sent a letter (setting forth his views) to Commissioner Ripley and met with him on August 2 at the DLI, with Arsenault present. Williams also met with Commissioner Ripley, requested that a hearing be held by DLI on the reinstatement of B & B as an authorized bidder, and asked that a "prevailing rate" be established for Danvers.

A hearing was held by DLI on August 30, 1983, with the senior counsel of DLI presiding as hearing officer. The hearing officer announced that he had been instructed (by Commissioner Ripley) not to permit any evidence regarding the prevailing wages in Essex County but only whether B & B was paying the Boston GAIU rates. Discussions after the hearing[6] soon became academic because Daniel Carter (the SPA) on August 31 told Galligan by telephone that "he was rebidding[7] the contract and that he had rejected both bids" — that of B & B only because of "the prevailing wage issue," and that of Acme

---

[6] After the hearing was over, Galligan, on August 30, 1983, complained to Commissioner Ripley by letter of the inadequacy of the hearing. He also talked by telephone with Deputy Secretary Williams who was disturbed, because of the passage of time, that he might not be able to ensure the timely provision of ballots.

[7] The reasons for the rebidding were explained by the SPA in an affidavit of September 28, 1983, and in testimony at trial, in which we perceive no lack of conscientious consideration by the SPA of the problems outlined in the text.

because Acme's bid did not comply with the contract specifications. B & B promptly started this litigation in the Superior Court on September 8, 1983.

On September 9, DLI announced a new rate of prevailing wages for Essex County, thus resulting in the reinstatement of B & B as a bidder. The rebidding[8] took place (after bids were invited from seven or eight printing companies) on September 9. Acme (with the benefit of knowing B & B's original bid of June, 1983) was the low bidder by some $40,000 to $50,000 below B & B,[9] the only other bidder.

### The Course of the Present Action

B & B's complaint sought damages and also injunctive and declaratory relief. It alleged in general terms many of the circumstances described earlier in this opinion and asserted in effect that it had been deprived "without rational . . . lawful basis" of its interest in being approved as the low bidder for the ballot contract and by DLI's decision to remove it from the approved list of bidders for State printing contracts without first affording it a fair hearing. It asserted also denial to it of the equal protection of the laws by disqualifying it for a contract because of its alleged failure to adhere to prevailing wage rates determined on the same basis used for other printing bidders

---

[8] The new Commissioner of Labor and Industries testified essentially that, as he gradually learned about the ballot printing controversy, he had ordered a new investigation of the prevailing wage situation, at least as it applied to B & B and Essex County. He also testified that he had been informed by assistants (and perhaps also by Arsenault) that it was a practice of DLI that, when a printing firm came under new ownership, the payment of prevailing wage rates by that firm would be reinvestigated. Commissioner Ripley did not know whether that "procedure" had been reduced to writing anywhere. We have been referred to no regulation prescribing this practice and our own examination of the Code of Massachusetts Regulations (C.M.R.) has revealed no such rule. See 802 C.M.R. 2.00 (1978) for the very general regulations affecting the SPA. Much more detailed regulations appear to have been prescribed for competitive bidding for construction contracts under G. L. c. 149, §§ 44A-44J. See 810 C.M.R. 4.01-6.12 (1985). In the absence of properly published pertinent regulations, see G. L. c. 30A, §§ 3A-8, any failure of B & B to be in compliance with the ambiguous practice is excusable.

[9] B & B carefully reserved in writing, when making its new bid on September 9, 1983, all its rights to damages and to reinstatement of the earlier award to it made after the June bids.

from various other parts of Massachusetts.[10] At trial the issues really contested were (1) whether B & B had been deprived in bad faith by Commonwealth officers or agencies of the ballot contract, at least tentatively awarded to it, and (2) whether, if B & B had been so deprived, it was entitled to recover lost profits.

B & B introduced evidence designed to support its position on each of these issues. The evidence principally relied on to show bad faith by the defendant agencies and officers was the initial and unduly prolonged disqualification of B & B on July 22 by Arsenault and DLI by their use of the GAIU Boston contract rates (later essentially repudiated by the new Commissioner of Labor and Industries on September 9, 1983, on the very day that new bids were to be received). There was substantial evidence from the SPA and from Deputy Secretary Williams that the sole reason for calling for new bids was that Arsenault and DLI had failed to give approval to B & B as paying "prevailing" wages.

On the issue of lost profits, B & B offered (without objection by defense counsel) Galligan's testimony concerning how its staff of estimators calculated its original bid of $1,500,000. Galligan's most relevant testimony was that the "estimators calculated that price by going through each page of the bid specification[s] for the various quantities involved, figuring out the paper cost, the labor cost, distribution charges, and marking up the prices ten percent for profit." B & B's counsel then asked, "Q. So of the $1,500,000 contract, that included a 10-percent profit figure? A. Ten-percent pre-tax profit is correct."[11]

---

[10] Preliminary injunctive relief was denied on October 3, 1983, by a Superior Court judge. No appeal from that denial is argued. During trial before another Superior Court judge, B & B's counsel expressly waived any claim to relief under 42 U.S.C. § 1983 (1982).

[11] The agencies on May 15, 1985, the last day of trial, filed two motions in limine requesting that the judge exclude (a) all evidence relating to damages to B & B "based upon lost profits," and (b) evidence relating to the existence and establishment by DLI of existing wage rates in the printing industry. The judge at no time appears to have allowed either such motion. In the absence of a ruling on the motions in limine, it was incumbent on

The defendant State officers and agencies filed motions for directed verdicts at the close of B & B's evidence and (as the defendant offered no evidence) also at the close of all the evidence. The judge denied both motions and submitted the case to the jury on special questions[12] which are set out in the margin with the answers (all favorable to B & B) by the jury. Instructions given by the judge explained these questions and stated the law which should be applied by the jury in giving answers.

The judge told the jury that B & B must prove by a fair preponderance of the evidence first that the defendant's conduct "was arbitrary or capricious or that the defendant acted in bad faith," and, second, that such conduct was the proximate cause

---

the defendant (to preserve appellate rights) to object when evidence (of the type covered by the motions) was offered and certainly to move to strike it, if it was admitted. See *United States* v. *Wagoner,* 713 F.2d 1371, 1374-1375 (8th Cir. 1983); *Petty* v. *Ideco, Div. of Dresser Indus., Inc.,* 761 F.2d 1146, 1150 (5th Cir. 1985). See also *Everson* v. *Casualty Co. of America,* 208 Mass. 214, 218 (1911); *Brek's Case,* 335 Mass. 148-149 (1956); *Peterson, petitioner,* 354 Mass. 110, 115 (1968). Liacos, Massachusetts Evidence, 442, (5th ed. 1981).

Galligan, prior to his testimony above, had testified that B & B on "a very involved bid" had spent a great deal of time and effort reviewing the quotations, involving conferences with key people on B & B's staff, and obtaining clarification "on the exact bid specifications" from SPA and the State Secretary's office. On cross-examination, the defendant's counsel brought out that B & B made bids on contracts generally with a built-in profit margin of ten percent and that sometimes B & B came "out a little bit higher" and sometimes "a little bit lower."

[12] The special questions are set out below. The jury's reply is shown in brackets following each question. 1. Was the conduct of the defendants, or either of them, arbitrary or capricious? [Yes] 2. If your answer to question # 1 is yes, was such arbitrary or capricious conduct the cause of the re[s]cis[s]ion of the contract award to the plaintiff? [Yes] 3. If your answer to question # 2 is yes, what amount of money do you say will fairly and adquately compensate the plaintiff for the cost of preparing the bid proposal? [$10,000] 4. Did the defendants, or either of them, act in bad faith in rescinding the contract award to the plaintiff? [Yes] 5. If your answer to question # 4 is yes, was such bad faith the cause of the re[s]cis[s]ion of the contract award to the plaintiff? [Yes] 6. If your answer to question #5 is yes, what amount of money do you say will fairly and adequately compensate the plaintiff for lost profits which resulted from the re[s]cis[s]ion? [$150,000].

of any injury which they (the jury) might find to have been done to B & B. B & B claims, the judge said, that the defendant failed "to give fair consideration to" B & B's bid and violated the statutes which regulate the award of printing contracts "by rescinding the contract once it had been awarded to" B & B.

The judge then instructed the jury (1) that, if they found that the defendant's conduct was arbitrary and capricious, they could award to B & B the cost to it of preparing its original bid, and (2) that, if they found that the setting aside of the original award was because the defendant acted in bad faith, they also might award to B & B as damages the amount which they found B & B to have lost in profits because of "such bad faith rescission."[13] At the close of the charge, counsel for the defendant told the judge that he had no objections to his instructions.

Judgment on the verdict was entered on May 29, 1985, for B & B for $160,000 with interest from September 8, 1983, and costs. Motions of the defendant for new trials and the motion for judgment n.o.v. were denied. Appeals have been claimed.

*Discussion*

1. The Massachusetts law with respect to competitive bidding has been discussed largely in connection with bid proposals submitted for construction contracts under G. L. c. 149, §§ 44A-44J. There is considerable similarity between those provisions of c. 149 and the scheme of competitive bidding set out in G. L. c. 5, § 1 (amended subsequent to the final award of the 1984 ballot contract by St. 1986, c. 557, § 3), and related statutory provisions. The objectives of the two competitive bidding statutes are essentially the same.[14]

---

[13] The term "bad faith" was defined in the charge in a manner generally consistent with Black's Law Dictionary, 127 (5th ed. 1979).

[14] See *Interstate Engr. Corp.* v. *Fitchburg,* 367 Mass. 751, 757-758 (1975), commenting on the statutory objective of the pertinent provisions of G. L. c. 149. In addition to the statutory purpose (not always achieved) of obtaining low bids for the public contracting authority in the first instance, it was noted that a second statutory objective was to establish "an honest and open procedure for competition for public contracts and, in so doing, [to] place[] all general contractors and subbidders on an equal footing in the competition to gain the contract. The statutory procedure facilitates the

2. In the present situation, B & B, although notified of the award to it, never signed the contract. The record also does not show that B & B ever filed the performance bond of $500,000 called for by art. 11 of the proposed agreement. We assume that the award to B & B was withdrawn by SPA before the binding formal contract came into effect. See Restatement (Second) of Contracts, § 27 (1981).

In *Paul Sardella Constr. Co.* v. *Braintree Housing Authy.,* 3 Mass. App. Ct. 326, 333 (1975), approved in this respect in 371 Mass. 235, 243 (1976), no final award (see 371 Mass. at 238 and 241) had been made to a general bidder (under G. L. c. 149). The bidder later was deprived of the contract because of erroneous administrative action apparently taken without bad faith (see 3 Mass. App. Ct. at 335). The general bidder thus deprived of this contract was held entitled to the reasonable cost of preparing his bid. In the *Sardella* case, at 335 this court expressly stated that it was not called upon to determine what the measure of damages would have been if the housing authority had acted in bad faith.

In *Roblin Hope Indus., Inc.* v. *J.A. Sullivan Corp.,* 6 Mass. App. Ct. 481, 489-491 (1978), *S.C.* after remand, 11 Mass. App. Ct. 76 (1980), a general contractor (chosen by competition under G. L. c. 149) in bad faith deprived a subbidder of his subcontract in violation of G. L. c. 149, § 44F. The subbidder was held to be entitled to recover from the general contractor anticipated profits and not merely its cost of preparing the subbid.[15]

---

elimination of favoritism and corruption as factors in the awarding of public contracts and emphasizes the part which efficient, low-cost operation should play in winning public contracts" (footnote omitted). The statutory bidding procedures of G. L. c. 5, § 1, plainly are framed with the same purposes, viz., to obtain the lowest reasonable prices and to assure qualified bidders of fair treatment if they submit bids.

[15] This court said (6 Mass. App. Ct. at 490-491), "[T]he public interest requires that damages be awarded to ensure that the public bidding laws are complied with, as failure to ensure that all bids are treated fairly could result in fewer bids being submitted for public contracts," citing the *Sardella* case, 3 Mass. App. Ct. at 334. The opinion continued, "In the case of a public agency acting in good faith, the payment of bid preparation costs as

3. These most pertinent Massachusetts decisions leave undecided the issue whether failure of officers or agencies of the Commonwealth itself (and not merely a private general contractor or a local government or a public authority) to consider public contract bids fairly, in good faith, and in compliance with the applicable competitive bidding statutes, will subject the Commonwealth to liability for profits lost by the bidder to whom the contract should have been awarded in all fairness. The public objectives of public competitive bidding statutes, discussed by the Supreme Judicial Court in the *Sardella* case and by this court in that case and in the *Roblin Hope* cases, seem to us to be equally cogent, whether it is the Commonwealth which is soliciting bids or some political subdivision or authority doing so. Failure to give fair consideration in good faith to all bids in either situation will tend to discourage bidders and to destroy public confidence in the competitive bidding system. Upon adequate proof that agencies or officers of the Commonwealth have set aside in bad faith an award of a contract to a qualified low bidder, the cases already mentioned should be extended appropriately to permit recovery by the bidder of its lost profits.[16]

4. The defendant has argued principally that no showing has been made by B & B that the SPA, the contracting officer,

---

damages is sufficient sanction to ensure compliance with the bidding laws. In a case such as this, however, where a private contractor is involved and the general contract price has been adjusted upward by a much greater amount than the bid preparation costs, and there is no way to ensure that this entire increase in the contract amount will go to the subcontractor, an award of damages in the amount of the plaintiff's anticipated profits is required as a deterrent to ensure good faith compliance with the bidding statute" (footnote omitted).

[16] The benefits of the competitive system are shown by the facts of the present case. B & B by its original bid cut Acme's original bid nearly in half. Competition thus forced Acme, when the ballot contract was rebid on September 9, 1983, to go significantly below B & B's original bid. If the contract had not been rebid and B & B had been disqualified as a bidder, Acme might have made an unconscionable profit at public expense, unless both B & B's original bid and Acme's later bid were in fact too low. Here the Commonwealth has been saved over $1,300,000 by B & B's possibly hazardous original bid.

was guilty of any bad faith or failure properly to consider B & B's bid. General Laws, c. 5, § 1, makes the SPA merely the nominal representative of the Commonwealth in the exercise of any discretion as to the "prevailing" wage issue, which was the sole cause (relating to B & B) of the decision to ask for new bids on the contract. The "prevailing" wage issue, was committed by c. 5, § 1, solely to DLI. The SPA, under § 1, could not execute the ballot contract with B & B while that company was disqualified by DLI.[17]

That issue was presented for decision by DLI at the very moment a new commissioner for DLI was taking office and when the DLI chief inspector in charge of setting "prevailing" wages for the printing industry was about to retire. These circumstances may have contributed in some degree to the setting aside of the award in view of the State Secretary's pressure to get a contract soon enough to ensure having ballots ready for the 1984 primary and final elections. In any event, we think consideration of whether State action was arbitrary, capricious, or in bad faith cannot be confined to the SPA but also must be based on the aggregate action of DLI and of all the officers and agencies in behalf of which SPA was to award the contract.

The jury, of course, heard all the evidence and saw the witnesses and (acting in accordance with instructions from the judge to which no objection was made) decided (see note 12, *supra*) that setting aside the contract award was not only arbitrary and capricious but done in bad faith. The judge (in the absence of the jury) remarked to counsel that, while B & B's

---

[17] The right to reject all bids found in G. L. c. 5, § 1 (see the emphasized language in note 1, *supra*), we think, does not justify ordering a new round of bids if that is necessitated by State action in bad faith, as the jury found to be the case here. Such a provision, in the absence of bad faith, may preclude a bidder's claim that contractual obligations arose automatically with the making of a low bid. See 1 Williston, Contracts § 31 (3d ed. 1957 & Supp. 1986); 10 McQuillin, Municipal Corporations § 29.77 (3d ed. rev. 1981). The *Sardella* case, 3 Mass. App. Ct. at 332, however, states, "Neither the reservation of a right to reject any and all proposals in the notice to contractors [under G. L. c. 149] nor the possibility that some violation of the statute might result in a benefit to the public warrants disobedience of the statutory mandate," which, of course, reflects the statutory objectives. Contrast *John J. Brennan Constr. Corp.* v. *Shelton*, 187 Conn. 695 (1982).

case was "not the clearest case in the world, . . . there . . . was sufficient evidence to warrant the jury deciding it." We agree that the evidence, and especially a variety of permissible inferences therefrom, about DLI's actions on the "prevailing" wage issue made it proper for the judge to submit the case to the jury. See generally *Catamount Constr., Inc.* v. *Pepperell,* 7 Mass. App. Ct. 911 (1979). His instructions obviously were based on the decisions already cited.

5. The judgment must be modified in one respect as duplicating damages. If the contract had been awarded to B & B on its original bid, B & B in effect would have paid its bid preparation costs as an expense of performing the contract. B & B's profit would have been what it received after paying such bid costs (for which it would not have been reimbursed). B & B's recovery of lost profit adequately compensates it. The judgment must be reduced by $10,000 (and any related interest to be computed in the Superior Court). This point was not very clearly argued in the defendant's briefs but their motions for a new trial were based in part on the ground that damages were excessive.

6. We recognize that, in the circumstances, no lost profits (but only bid preparation costs) would be awarded to B & B in the Federal courts under different competitive bidding statutes and regulations. See, e.g., *Keco Indus., Inc.* v. *United States,* 492 F.2d 1200 (Ct. Cl. 1974), and cases cited. See also *Kinetic Structures Corp.* v. *United States,* 6 Cl. Ct. 387, 392 & n.2 (1984); *Aviation Enterprises, Inc.* v. *United States,* 8 Cl. Ct. 1, 15-16 (1985). See also *Cincinnati Electronics Corp.* v. *Kleppe,* 509 F.2d 1080, 1089 (6th Cir. 1975).[18]

7. The judgment must be modified as stated in part 5, *supra.* As thus modified, the judgment is affirmed.

*So ordered.*

---

[18] In this case, no issues of the proper method for use by DLI in computing "prevailing" printing wages have been argued to us. No issues of the propriety of the special questions put to the jury or of the judge's instructions have been adequately preserved for appellate review. The defendant's briefs do not argue that B & B had no standing to prosecute this action. See, generally, the discussion in *Minton Constr. Corp.* v. *Commonwealth,* 397 Mass. 879, 880 (1986).