Garsh, J.
White’s Farm Dairy, Inc. (“White’s”) alleges that the City of New Bedford (“City”) improperly awarded a contract for dairy products for public schools to its competitor Baby G Farms, Inc. (“Baby G”) in violation of the Uniform Procurement Act, G.L.c. 30B, §§1 et seq. The complaint, brought pursuant to G.L.c. 231A, seeks to have the contract declared invalid as well as injunctive relief and compensatory damages. Because the contract period had expired prior to trial, White’s now seeks only the cost of its bid preparation as well as lost profits. A jury-waived trial was held at which three witnesses testified, several exhibits were introduced, and the parties stipulated to numerous facts.
FINDINGS OF FACT
Based on all the credible evidence and reasonable inferences drawn from that evidence, the court finds the following facts:
White’s is a corporation organized under the laws of the Commonwealth of Massachusetts with a usual place of business in Acushnet, Massachusetts. Baby G is a corporation organized under the laws of the Commonwealth of Massachusetts with a usual place of business in Lakeville, Massachusetts. The City is a corporate body politic of the Commonwealth of Massachusetts and a political subdivision located in Bristol County.
On May 15, 1998, the City publicly invited the submission of sealed bids for the provision of milk and other milk products for the New Bedford public schools. The City did so byway of a document entitled “Invitation to Bid” and identified as “Invitation No. *349 317" (the “Invitation”). The Invitation states that ”[a]ll bids are subject to the terms and conditions included in bid package." The City reserved the right to reject any and all bids. In the Invitation, the City stated that sealed bids on a prescribed form would be received and verified on June 5, 1998 at 3:00 p.m. and would be publicly opened and read at that time.
The Invitation contains inconsistent and confusing references with respect to the period of the contract. Page one of the Invitation indicates that the City was soliciting bids for dairy products for the School Department Food Service Division, “School year 9/1/98 thru 6/30/99.” Page three of the Invitation, under the heading “Milk Contract,” states that “Vendor is expected to pick up milk during vacation/summer as arranged.” Page four of the Invitation states that “[t]he price quoted will be firm during the month of July, the first month of delivery.” That same page also states that “(m]ilk is to be delivered to 29 schools through the city of New Bedford, MA, as per attached." The attachment lists eleven schools as delivery sites and an additional eighteen possible school locations for delivery. Page five of the Invitation, under the section heading “New Bedford Public Schools Food Service Contract Agreements,” states in the first paragraph: “Provided is a copy of the specification sheets for contract period — July 1, 1998 thru June 30, 1999.” One of the specifications is that the Food Service Department will consider it a violation of the contract and will go to another vendor “[i]f prices are not held for 12 months.”
When the City issued its Invitation, it intended the winning vendors to provide milk and other dairy products to the New Bedford Public Schools for a twelvemonth period beginning June 29, 1998, the first day of summer school. The amount required during the summer is significantly lower than during the school year, and milk is delivered to only two schools during the summer months. Based on past experience, White’s assumed, when it submitted its bid, that the winner would be supplying some dairy products during the summer of 1998. There is no evidence as to what other bidders assumed.
Page two of the Invitation is a four-column form entitled “Milk Specifications.” The first column lists the following seven items: whole milk, low fat milk, skim milk, low fat coffee milk, low fat chocolate milk, cottage cheese, and half and half creamers. Straws are not a listed item. The City did not solicit and did not intend to solicit a bid on wrapped straws. The second column, “Pack,” provides a quantity for each item. The third and fourth columns, “CS/Pack” [case price] and “Unit/Price,” were left blank to be completed by each bidder.
Page four of the Invitation lists nine “ [specifications for half pints of milk to be delivered to all schools listed as ordered and required during the term of contract.” The specifications include such items as milk to meet standards and requirements of the state department of health and local board of health, milk to have a certain minimum butter fat content, milk to be in paper containers, and bidder to have capability for microbiological testing and control. Specification number six states: “Individually wrapped straws in sufficient quantity to be supplied by contractors.”
The Invitation is clear that straws must be provided by any vendor chosen to supply half pints of milk. It is equally clear that the City was not seeking a line item bid on straws. The specifications had remained unchanged from the previous year’s invitation to bid. However, in the interim, the City had decided to meet its need for straws as part of a separate nonperishable bid, and straws were being supplied inside individually wrapped packages containing a straw, a napkin and a “spork.” The reference to straws in the Invitation should have been deleted before the Invitation went out but, through inadvertence, was not. White’s interpreted the Invitation as requiring it to submit a bid on straws and deemed straws simply to be another item to be determined on a line item basis despite the absence of straws as a line item on the chart on page two of the Invitation. Inclusion of a requirement in the Invitation that straws be part of any delivery of half pints of milk when straws, in fact, are not required to be delivered is misleading and does not convey adequate information to bidders.
The Invitation also specifies that “[Contracts are awarded per line/low price and satisfaction of each item.” Following receipt of the Invitation, White’s had a conversation with the City’s Purchasing Agent, Lawrence Oliveira (“Oliveira”), expressing surprise that the bids were to be analyzed on a “per line/low price” basis since that method in the past had resulted in the winner of the chocolate milk contract ending up with the entire dairy contract by default. During the previous year, Oliveira had agreed that it would be a good idea to assess the bid as a package and not by line item.
After the Invitation was issued, the School Department learned that the Board of Health was insisting that coolers for dairy products be at each school site. The School Department owned several coolers, but not as many as the Board of Health required, and there were insufficient funds in the School Department’s budget to purchase additional coolers. As a result of consultations between Nancy Carvalho (“Carvalho”), the Food Service Supervisor for the New Bedford Public Schools, and the School Department, it was decided to require the vendor who provided the milk product to provide the coolers as well. To accomplish this end, on or about May 27, 1998, the City published an addendum to the Invitation (“the Addendum"). The Addendum was prepared by Carvalho and reviewed and edited by Oliveira. The Addendum stated:
We are requesting between 15-18 school milk coolers to be supplied and serviced by low bidder as part *350 of the milk contract. Cooler sizes will range from 8 case-16 case. Please specify if there is a charge.
Locations for these milk coolers will be designated at a later date by Food Service Supervisor.
THIS ADDENDUM NO. 1 MUST BE ACKNOWLEDGED IN THE SPACE PROVIDED FOR ON THE BID FORMS.
When the Addendum was issued, the School Department had not yet determined how many coolers were required. Each school at which a vendor’s cooler was to be placed could accommodate only one cooler. The City anticipated that only one vendor would provide all the coolers, not that coolers would be supplied by the low bidder on each milk contract awarded. The City did not intend the Addendum to be a solicitation for coolers as an additional line item based upon which a separate contract for coolers would be awarded.
The Addendum is confusing as it suggests that any vendor who is the low bidder on a dairy item and who chooses to accept the City’s award of a milk contract would be “requested” to provide coolers. Implicit in the use of the word “request” and in asking for a specification “if there is a charge” is the assumption that the City, once it knows the amount that a vendor will charge, can decline to have the vendor supply and service coolers. The Addendum uses no words that require a low bidder to provide coolers. The City nevertheless construed the Addendum as requiring the undefined “low bidder” to provide coolers. When it issued the Addendum, the City did not know precisely how many coolers it intended a low bidder to be required to supply and service nor the size of those coolers. Nothing in the Addendum puts a bidder on notice that if it specifies a charge for coolers, that charge would be a factor in the City’s “per line, low price” analysis of milk items.
Approximately a week before bids were due, White’s contacted Carvalho and inquired as to exactly how many coolers the City was requesting because he wanted to have that information in calculating what he would charge for coolers. Carvalho, who was surprised that there was to be any charge at all, advised White’s that the School Department did not yet have the information he was requesting. She did not inform him that the School Department expected not to be charged for coolers. She did not inform him that, if White’s included a charge for coolers in its bid, then when the City performed its “per line, low price,” analysis of the milk bids, it would adjust White’s unit price bid upward to reflect said charge. She also did not inform him that the City deemed its “request” for coolers to be a requirement. White’s did not interpret the Addendum as requiring a successful bidder to provide coolers.
The City received four bids in response to Invitation #317. The bids were publicly opened on June 5, 1998. A representative of White’s was present when the bids were opened.
White’s submitted a timely and otherwise appropriate bid containing the following per-unit prices:
Whole Milk .1601
Low Fat Milk . 1503
Skim Milk .1404
Low Fat Coffee Milk .1519
Low Fat Chocolate Milk .1399
Cottage Cheese .8232
Half and Half Creamers 9.00
Wrapped Straws .002
White’s response to the Addendum was to specify the following charges:
8 Case Cooler $200.00 yearly rental
12 Case Cooler $250.00 yearly rental
16 Case Cooler $300.00 yearly rental
Baby G submitted a timely and otherwise appropriate bid containing the following per-unit prices:
Whole Milk .1568
Low Fat Milk .1568
Skim Milk .15092
Low Fat Coffee Milk . 14504
Low Fat Chocolate Milk .1421
Cottage Cheese .7252
Half and Half Creamers 8.388
Baby G did not submit a bid for wrapped straws. There is no evidence as to whether or not Baby G assumed that it was required to provide straws at no charge and, accordingly, factored in the cost of wrapped straws when it calculated what price to bid on the milk items.[2] Baby G’s bid acknowledged the Addendum and indicated it would not charge for coolers.
White’s submitted the low bids for low fat chocolate milk, low fat milk, and skim milk. Baby G submitted the low bids for whole milk, coffee milk, cottage cheese, and half and half creamers. Both White’s and Baby G were responsible and responsive bidders, as were the two other vendors who submitted bids.
On or about June 29, 1998, White’s contacted Oliveira and discussed the discrepancy between White’s bid and Baby G’s with respect to coolers. Oliveira indicated that he might recommend that the City rebid the contract. However, he did not promise to do so.
When the City analyzed the bids, it disregarded White’s bid for straws. The consideration of White’s bid was not adversely impacted by its inclusion of a bid for straws. White’s per-unit bid for milk products would not have been less had the Invitation been clear that straws need not be provided.
Prior to analyzing the bids, Carvalho, the person in charge of doing so, had determined that the City needed six coolers in each of the following sizes: 8 cases, 12 cases, and 16 cases. Coolers were not needed during the summer months. Carvalho was unsure how to proceed with the comparative analysis of the bids given the fact that the amount of money the City would have to pay to obtain the necessary coolers would have an impact upon the total amount of money *351 the City would have to pay to secure milk products. Carvalho had a conversation with White’s in June in which she indicated that she was not sure how the City would proceed given that White’s bid included a charge for coolers and Baby G’s bid did not. She stated that there might be some delay while the issues raised by the Addendum were clarified.
Following her conversation with White’s, Car-valho discussed the problem with Oliveira. This discussion included the fact that White’s had inquired as to how City intended to analyze the bids. Oliveira raised the possibility of rebidding the contract, but Carvalho rejected that suggestion on the ground that she needed milk delivery to begin on June 29, 1998 for the summer school program. Oliveira agreed that Carvalho should come up with a formula to derive a truer unit price by factoring in the cost of the coolers in a way that related the cooler cost to the items in the cooler. Accordingly, Carvalho devised a formula. The City did not, however, advise any of the bidders that it would employ such a formula in evaluating their bids.
The City derived a daily rental charge of $25.00 for White’s coolers by dividing $4,500.00 by 180. The sum of $4,500.00 represented the total annual amount that the City would be charged by White’s if White’s were to supply the eighteen coolers that were needed by the City. The number 180 represented the number of days in a school year, not including summer school. In order to derive a daily rental charge that could be used in analyzing the chocolate milk bids, the City multiplied the $25.00 daily rental charge for coolers by eighty-four percent. This resulted in $21.00 being considered by the City as a per day cooler cost for chocolate milk should White’s supply the coolers. If the only products considered are chocolate milk, skim milk, and low fat milk — the three products for which White’s was the low bidder — chocolate milk would account for eighty-four percent of the milk sold to the School Department.[3] The City calculated that the cost of renting coolers from White’s would, in effect, increase the cost of buying a unit of chocolate milk from White’s by .0032. Therefore, in comparing the bids, it increased White’s unit price to .1431. A unit price of .1431 was higher than Baby G’s unit price of .1421. Baby G’s unit price was not adjusted since Baby G had stated that it would not charge for the coolers. Based solely upon application of its formula, the City determined that Baby G and not White’s was the low bidder on chocolate milk. Even with application of the formula, White’s remained the low bidder on low fat milk and on skim milk.
The $25.00 cooler cost per day derived by the City does not accurately reflect White’s annuaized bid for coolers since the vendor would have to make the coolers available to the School Department many more than 180 days. The School Department expected that the coolers would remain in place at schools during weekends and school vacations, except during the summer months when coolers were not required. If the daily rental charge were reduced by dividing the annual cooler cost of $4,500.00 by the number of days the coolers would actually be at school sites, White’s bid would be lower than Baby G’s, even after factoring in the cost of the coolers for those days. Such an approach, however, makes little sense if the object is to ascertain the true cost to the City since it fails to take into account the cost to the City for the coolers during the weekends and vacation days on which milk is not being purchased. If cooler costs may be taken into account and if 84 percent of the cooler costs are properly allocable to chocolate milk, the City would pay more to purchase chocolate milk from White’s than from Baby G.[4]
Deriving a cooler cost per day pro rata by product (e.g. calculating 84 percent of the total per-day cost for chocolate milk, 3 percent for skim milk, and 13 percent for low fat milk) is irrational as it does not accurately reflect the Ciiy’s intent to permit only one vendor to supply coolers. The City had insufficient space to permit more than one cooler at each site.
Further, the coolers were intended to hold all the milk products to be delivered and not simply chocolate milk, skim milk, and low fat milk. Accordingly, if it were appropriate to calculate a cooler per day cost by product in an effort to adjust the unit prices in White’s bid, it was irrational to use percentages for three products which added up to 100 percent when such products amounted only to slightly less than fifty percent of the milk products for which bids were sought. The fact that White’s was the low bidder only on three items does not mean that, in calculating the City’s daily cost for coolers by product, the other milk items which would take up room in the cooler could be disregarded. The Invitation estimates that the City will purchase daily 16,013 units of milk, of which chocolate milk will constitute 41.44 percent, whole milk will constitute 26.51 percent, coffee milk will constitute 24.26 percent, low fat milk will constitute 6.53 percent, and skim milk will constitute 1.27 percent.
If the City had used its same formula but had multiplied the $25.00 cooler cost per day by 41.44 percent instead of by 84 percent, it would have awarded the chocolate milk contract to White’s. The cooler cost for chocolate milk per day would have been $10.36 and not $21.00. This additional expense was not high enough to make it economically more beneficial for the City to pay Baby G’s unit price for chocolate milk.[5]
The formula also is irrational because it does not accurately reflect the relative percentage of chocolate milk to other milk products in those schools which were to receive coolers. Of the twenty-nine schools to be supplied with milk, only eighteen were to have coolers provided by a vendor. According to the Invita *352 tion, which sets out the daily usage requirements by school for whole, chocolate, coffee, low fat and skim milk, the percentage of chocolate milk to be delivered to the twenty-nine schools ranged from a high of 68.63 percent at Ingraham to a low of 22.22 percent at Ottiwell. Chocolate milk accounts for only 38 percent of all milk delivered to New Bedford High School, which receives more than twice the amount of chocolate milk delivered to any of the other schools. There is no evidence as to whether New Bedford High School already had a cooler or if it was one of the eighteen sites destined to receive a cooler from a vendor. Which schools were to receive the coolers could affect whether the City would save by purchasing chocolate milk from Baby G. Therefore, in order to accurately factor in the cost of the coolers by product, as the City wanted to do, the City would have had to separately multiply daily chocolate milk usage figures for each of the twenty-nine schools by White’s unit price and by Baby B’s unit price, total those sums, and divide each of the two totals by twenty-nine. To accomplish the City’s objective, the City should have used the unit prices in the bids for those schools which already had a cooler and, for each of the eighteen schools requiring a cooler, the City should have adjusted White’s unit price after calculating a per-day cooler cost for chocolate milk by multiplying $25.00 by a number equal to the percentage of milk products that chocolate milk represents for that particular school.
By using a formula to adjust the emit prices on the bids, the City unfairly employed criteria not previously announced to or known by bidders. Moreover, the formula the City employed was irrational. I infer that if the City had disclosed in the Addendum the formula that it eventually used or, indeed, if the City had disclosed that it intended to apply any formula to adjust the unit price on the milk bids to reflect the charge, if any, by the bidder for coolers, White’s would have submitted a different bid. Given its anticipated profit margin of at least $16,000.00 should it win the dairy contract,[6] it would have made economic sense for White’s to reduce or eliminate the $4,500.00 cooler charge in order to increase its chances of being the low bidder on chocolate milk.
In late June, the City verbally advised Baby G that it was being awarded the contract and asked Baby G to begin deliveries on June 29, 1998. No verbal notice was given to White’s that it would be awarded the skim milk and low fat milk contracts. Baby G began delivery of dairy products on June 29th. Its deliveries were not limited to the items on which the City had declared it to be the low bidder because the City anticipated that White’s, upon receiving the City’s purchase order for low fat and skim milk only, would choose to decline to supply these items to the School Department. Due to the economic disadvantage of having to deliver certain less popular milk products to City schools, for the past three years, the winner of the chocolate milk contract has obtained the contracts for the other milk products by default. Accordingly, notwithstanding the intent to award contracts “per line, low price” when it issued the Invitation, the City expected a single vendor to provide milk and other dairy products to the New Bedford Public Schools.
On or about July 1, 1998, the City formally awarded to Baby G its contract “to supply the City of New Bedford, School Department/Food service division, with dairy products.” In its award to Baby G, the City declared the contract period to be “the school year September 1, 1998 through June 30, 1999.” The award made no distinction among the various dairy products on which separate bids had been solicited despite the fact that Baby G, according to the City’s own calculations, was not the low bidder on either low fat or skim milk.
The City’s notification to White’s that it had won only the contracts for low fat milk and skim milk was by way of a purchase order mailed in late July to an incorrect address. White’s first learned on or about August 8, 1998 of the results of the bid evaluation when it received the City’s purchase order dated July 20, 1998 for low fat milk and skim milk for the “school year 1998-1999.” The purchase order does not mention coolers. White’s declined to sell skim milk and low fat milk to the City and complained to Carvalho about the award to Baby G. Carvalho explained the formula she had used and told White’s that the contract period had already commenced. White’s did not contact Oliveira. The first written document that the City received advising that White’s protested the award to Baby G was a memorandum dated August 27, 1998.
White’s wrote to the Office of the Inspector General (“Inspector General”) on September 1, 1998 and requested an inquiry into the award of the contract resulting from the Invitation.[7] In its response to an inquiry from the Inspector General, on September 18, 1998, the City Solicitor forwarded to the Inspector General a memorandum from Oliveira togther with a letter from White’s counsel responding to said memorandum. White’s counsel was copied on the transmittal letter. The memorandum from Oliveira states, in part:
. . . The milk was due to be delivered on June 29th at the start of summer lunch ... It was not until last Thursday that I became aware of any such conflict on our awarding the contract. This issue was settled, I thought, on June 25th. With school set to start next week, I question the timing of the issue being raised. We have been supplied with product for almost two months now by Baby G. I would think that White’s would have questioned earlier the summer orders. Their letter is over sixty days after our decision and nearly eighty days after the bid opening. They have been in business for *353 many years and have had the City contract in the past and are aware of ordering procedures.
Oliveira believed all the statements contained in his memorandum to be true. He had no ulterior or undisclosed motive. He did not intend to defraud or mislead the Inspector General and did not act with malice or ill will towards White’s. Oliveira’s statements are factually substantially true or constitute genuinely held opinion. The memorandum states that it encloses correspondence from the School Department showing that factoring in coolers would affect pricing. That correspondence indicates that the cost of renting coolers from White’s for 180 days was factored into the analysis.
I infer that the letter from White’s counsel to the City Solicitor responding to said memorandum and transmitted by the City to the Inspector General pointed out each statement in the City’s memorandum that White’s believed to be erroneous, a half-truth, or made in bad faith and also stated those facts which White’s believed were relevant.[8] The letter from White’s counsel to the Inspector General dated September 1, 1998 characterized the Invitation as one seeking a bid for the year commencing July 1, 1998 and ending June 30, 1999. The letter also directly addressed the “lateness” of White’s request, pointing out that “only recently did the City of New Bedford make its decision known after considerable delay.”
White’s incurred costs of $500.00 in preparing its bid in response to the Invitation. Taking into account the expenses saved by not winning the contract, the profit which White’s reasonably and fairly could have anticipated as a result of being the lowest responsible and responsive bidder on chocolate milk, skim milk, and low fat milk is $16,000.
RULINGS OF LAW
White’s contends that the City improperly awarded the dairy contract to Baby G in violation of General Laws Chapter 30B, the Massachusetts Uniform Procurement Act, which governs the procurement or disposal of supplies, services, or real property by government bodies. A plaintiff need not show that it would have received the challenged bid “but for” noncompliance in order to have standing under state bidding statutes. Rather, a potential to obtain the award is all that is required. See Modern Continental Constr. Co., Inc. v. Lowell, 391 Mass. 829, 835 (1984). In the present case, White’s has demonstrated not only a potential to obtain the milk contract in the absence of some of the alleged violations of Chapter 30B, but that it would in fact have won the chocolate milk award. Accordingly, White’s has standing to challenge the award to Baby G.
The purpose of bidding statutes such as Chapter 30B is to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally. Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass. 687, 691-92 (1982); Datatrol, Inc. v. State Purchasing Agent, 379 Mass. 679, 696 (1980). Competitive bidding serves the dual goals of obtaining the most favorable contract while ensuring fair competition. Cataldo Ambulance Service, Inc. v. Chelsea, 426 Mass. 383, 389 (1998). To effectuate these purposes, contracts made in violation of statutoiy bidding requirements are void and unenforceable. G.L.c. 30B, § 17(b); Phipps Products Corp., 387 Mass. at 691-92.
Although minor or merely formal deviations from statutory bidding requirements do not compel invalidation of a contract, strict adherence to statutoiy bidding requirements is required in matters of substance. Gil-Bern Construction Corp. v. Brockton, 353 Mass. 503, 506 (1968); Sciaba Constmction Corp. v. Boston, 35 Mass.App.Ct. 181, 185, rev. denied, 416 Mass. 1106 (1993). Whether a deviation is considered a minor technicality or a matter of substance depends upon whether invalidation is necessary to fulfill the legislative purpose. Phipps Products Corp., 387 Mass. at 692.
Non-compliance with the procedures established by the Legislature for the award of public contracts is not excused by the absence of bad faith or corruption, even where the violation results in a substantial reduction in cost to the taxpayers or otherwise benefits the public. Phipps Products Corp., 387 Mass. at 692; Interstate Engineering Corp. v. Fitchburg, 367 Mass. 751, 760-61, n. 16 (1975); Peabody Construction Co. v. Boston, 28 Mass.App.Ct. 100, 103 (1989). In other words, ”[t]hat the awarding authority, as contended here, had as one of their purposes a reduction in cost is of no consequence . . . Even the best of motives cannot excuse contravention of the statute." Grande & Son, Inc. v. School Housing Committee of North Reading, 334 Mass. 252, 258 (1956).
White’s correctly contends that the award to Baby G violated Chapter 30B, section 5(b), which provides in relevant part:
A procurement officer shall issue an invitation for bids for a procurement contract. The invitation for bids shall include . . .
(2) the purchase description and all evaluation criteria to be utilized pursuant to paragraph (e); and
(3) all contractual terms and conditions applicable to the procurement.
Paragraph (e) provides:
The procurement officer shall evaluate a bid based solely on the requirements and criteria set forth in the invitation for bids. Such criteria shall include the standards by which the procurement officer will determine acceptability as to quality, workman *354 ship, results of inspections and tests, and suitability for a particular purpose.
The inconsistent contract periods referenced throughout the Invitation violated Chapter 30B, section 5(b)(3), which requires an invitation to bid to disclose all contractual terms and conditions applicable to the procurement, as well as section 12, which provides in relevant part that “the procurement officer shall include in the solicitation the term of the contract and conditions of renewal, extension or purchase, if any.” G.L.c. 30B, §12. The inconsistent contract periods constitute a substantial deviation from bidding requirements which defeated the legislative purpose of Chapter 30B by creating a situation in which bidders may have been unfairly confused over the required duration of their services. See Petricca Construction Co., Inc. v. Commonwealth, 37 Mass.App.Ct. 392, 397 (1994) (suggesting that ambiguous bid specifications would warrant the rebidding of a contract).
Further, the Invitation’s inclusion in the milk specifications of a requirement that bidders provide wrapped straws as part of their delivery of half pints of milk when, in fact, the City had already procured straws elsewhere, violated Chapter 30B, sections 5(b)(2) and 5(b)(3). The purpose of specifications in competitive bidding invitations is to state the quality and quantity of work required with as much certainty and definiteness as is practicable, such that bids may be submitted on a common basis permitting meaningful and fair comparison by the awarding authority. Datatrol, Inc., 379 Mass. at 697-99. Inclusion of wrapped straws in the Invitation’s specifications when the City was not in fact seeking to procure wrapped straws was misleading.
More importantly, the City violated G.L.c. 30B, §5(b)(3) and §12 by issuing an Addendum which purported to “request” school milk coolers but was deemed by the City to require such coolers and which purported to request that coolers be supplied “by low bidder” but was deemed by the City to require coolers to be supplied by only one of the low bidders to whom purchase orders would be issued. A public authority inviting bids may not, like Humpty Dumpty, choose to let words it uses in an invitation mean what the public authority chooses those words to mean.[9] When words in an invitation are invested with a meaning known only to the issuer of the invitation to bid, the legislative aim that bids be submitted on a common basis is thwarted. Fairness and equality require that bidders have the opportunity to bid in the same way and on the same information such that they bear the same risk of rejection. Petricca Construction Co., Inc., 37 Mass.App.Ct. at 397; Department of Labor & Industries v. Boston Water & Sewer Commission, 18 Mass.App.Ct. 621, 626 (1984). The City’s belated revelation of the meaning of the Addendum in the context of this litigation may “create grave une er tainty among all interested parties and arouse public suspicion that something is amiss in the selection system.” Thorn Transit Systems, Inc. v. MBTA, 40 Mass.App.Ct. 650, 657 (1996) (Brown, concurring).
Finally, the City violated G.L.c. 30B, §5(b)(2) by failing to set forth in the Addendum the criteria to be utilized in evaluating the bids for milk products. Chapter 30B requires that a procurement officer’s award of a public contract be based on the method advertised in the bid invitation, whatever that maybe, rather than on some other basis on which the City could have advertised for bids. See Mari & Sons Flooring Co., Inc. v. Southeastern Massachusetts University Building Authority, 3 Mass.App.Ct. 580, 587 (1975).[10] No language in the Addendum put a bidder on actual or constructive notice that its unit prices would be adjusted to reflect its charge for coolers, if any. Indeed, since the Addendum on its face simply requested that coolers be supplied, vendors reasonably could have concluded that they were not required to agree to supply and service coolers as a condition of securing an award for one or more milk products. Therefore, a vendor reasonably would not have foreseen the possibility of a formula being used to adjust unit prices, since obviously it would be unfair to compare one bidder’s unit price for chocolate milk who chose not to supply coolers with another bidder’s unit price for the same product who chose to supply coolers at a cost. Whether or not any bidder actually declined to supply coolers is irrelevant. The City’s use of an undisclosed formula to adjust White’s unit bids violated Chapter 30B. It deprived bidders of crucial information regarding the criteria to be used in evaluating the bids and resulted in the awarding of milk contracts on a basis not disclosed in the invitation. Compare Vining Disposal Service, Inc. v. Board of Selectmen of Westford, 416 Mass. 35, 36 (1993) (bid documents set forth the present value formula to be used in calculating the bids). Adjusting the unit prices to take into account cooler costs, if any, was a substantial deviation from statutory bidding requirements that defeated the legislative purpose of Chapter 30B. The City judged bids based upon an unannounced formula, unfairly penalizing bidders who were deprived of the opportunity to win milk contracts by adjusting their response to the Addendum.
In addition, the actual formula used by the City was irrational. It purported to adjust unit prices by taking into account, by product, what the City would pay for coolers but, in doing so, ignored the fact that more than chocolate, low fat, and skim milk would be stored in the coolers, and it failed to take into account that coolers were not required at many schools and that the percentages of milk products in the coolers would vary by school. For all these reasons, the award to Baby G of the 1998-1999 dairy contract resulting from the Invitation and Addendum violated G.L. chapter 30B and is void.
*355 Chapter 231A is an appropriate vehicle for determining the validity of public contracts awarded pursuant to G.L.c. 30B. Cataldo Ambulance Service, Inc., 426 Mass. at 384. In the present case, however, given that the contract period expired prior to trial, the issue of invalidating the award through declaratory judgment is moot, and White’s is left with damages as its sole remedy. Where a bidder has complied with all bidding requirements but is deprived of a contract through conduct of the awarding authority tantamount to bad faith, the public interest in ensuring that all bids are treated fairly may require that the bidder be allowed to recover its anticipated profits from the contract. Petricca Construction Co., 37 Mass.App.Ct. at 399; Bradford & Bigelow, Inc. v. Commonwealth, 24 Mass.App.Ct. 349, 358-59, rev. denied, 400 Mass. 1105 (1987).
White’s contends that the City acted in bad faith in making various statements in its September 18, 1998 memorandum to the Inspector General, who was conducting an investigation of the contract award at White’s request. White’s points to the statement, “The milk was due to be delivered on Jeme 29th at the start of summer lunch.” While conceding that the statement is substantially true, White’s contends that the statement is misleading because it suggests that a much longer period than 180 days was utilized in the formula to evaluate bids and because the City failed to mention that the actual contract did not list June 29th as the starting date. White’s further points to the statements:
It was not until last Thursday that I became aware of any such conflict on our awarding the contract. This issue was settled, I thought, on June 25th. With school set to start next week, I question the timing of the issue being raised ... I would think that White’s would have questioned earlier the summer orders.
White’s contends that these statements were made in bad faith because they conceal the fact that Oliveira spoke to White’s in late May or early June about the line item format of the bid, because Oliveira should have known that use of Carvalho’s formula would not remedy the problems posed by the Addendum, and because the City improperly suggests that White’s did not make a timely complaint about the contract award.
White’s thus contends that the City, in bad faith, misled the Inspector General, entitling it to lost profits. Other than by forwarding this letter, White’s does not contend that the City acted in bad faith. White’s has cited no authority, and this court has located none, supporting the proposition that an awarding authority’s conduct during an investigation by the Inspector General following an award can constitute the type of bad faith which supports an award of lost profits under Chapter 30B. The remedy of lost profits is intended to vindicate the public interest in ensuring that all bids are treated fairly. See Bradford & Bigelow, Inc., 24 Mass.App.Ct. at 359. The cases analyzing bad faith invariably concern an awarding authority’s actions in the evaluation of bids and award of the procurement contract. See, e.g., E. Amanti & Sons, Inc. v. Barnstable, 42 Mass.App.Ct. 773, 778 (1997) (suggesting that an awarding authority’s conduct in including certain requirements in its invitation and rejecting a bid based thereon, if directed at a particular bidder, would constitute bad faith); Peabody Construction Co., 28 Mass.App.Ct. at 104-06 (discussing whether an awarding authority’s rejection of a particular bid as nonconforming constituted bad faith); Bradford & Bigelow, Inc., 24 Mass.App.Ct. at 360-61 (discussing whether an awarding authority set aside an award and rebid the contract in bad faith); Roblin Hope Industries, Inc. v. J.A. Sullivan Corp., 6 Mass.App.Ct. 481, 491 (1978) (stating that an awarding authority’s stubborn insistence on using a favored contractor for a public contract, regardless of the public interest, would constitute bad faith).
The communication with the Inspector General did not deprive White’s of the contract as it had been awarded to Baby G approximately two months before any communication between the City and the Inspector General. Review by the Inspector General is not a necessary step in the award of a procurement contract under Chapter 30B. Chapter 30B, section 17(d), relied upon by White’s, merely states that the Inspector General, if so authorized by the attorney general, may institute a civil action for damages against persons causing or conspiring to cause a contract to be solicited or awarded in violation of the statute’s requirements. Pursuant to Chapter 12A, section 7, the Office of Inspector General “shall act to prevent and detect fraud, waste and abuse in the expenditure of public funds, whether state, federal, or local, or relating to programs and operations involving the procurement of any supplies, services, or construction by [government entities].” G.L.c. 12A, §7. The Inspector General is authorized to “make such investigations, audits and reports relating to the administration of the programs and operations of the applicable public bodies described in section seven, as are in [his] judgment necessary and may conduct an examination of public documents.” G.L.c. 12A, §9. Such an investigation may be initiated in response to a complaint or referral from any source, including a private contractor such as White’s. See 945 Code Mass. Regs. §§1.04(1)(a), (2)(a). The Inspector General may report and refer his investigative findings to the attorney general or to any other federal, state or local agency with an interest therein. See 945 Code Mass. Regs. §1.09. Thus, while a disappointed bidder such as White’s may complain to the Inspector General about the award of a public contract under Chapter 30B and seek an investigation, the Inspector Gen *356 eral is not authorized to invalidate a contract award ororderrebidding. Investigation by the Inspector General is in no sense an integral part of a contract award under Chapter 30B. Where such an investigation occurs , an awarding authority’s attempt to persuade the Inspector General that its award of a procurement contract was valid does not form the basis for recovery of lost profits under Chapter 30B.
Moreover, even assuming that the remedy of lost profits is available under Chapter 30B for bad faith conduct committed in connection with an inquiry from the Inspector General following an award of a contract, White’s has failed to demonstrate that the statements it complains of were made in bad faith. Bad faith is not simply bad judgment or negligence. Rather, it implies the conscious doing of a wrong, some dishonest purpose or moral obliquity, or the breach of a known duty out of ill will or some interested or ulterior motive. Spiegel v. Beacon Participations, Inc., 297 Mass. 398, 416 (1937); Parker v. D’Avolio, 40 Mass.App.Ct. 394, 402-03, rev. denied, 423 Mass. 1102 (1996). The statements in the City’s memorandum to the Inspector General to which White’s objects are substantially true or constitute Oliveira’s genuinely held opinion. Oliveira did not make such statements with an intent to mislead the Inspector General.
In the absence of bad faith, a bidder wrongfully deprived of a contract by an awarding authority’s failure to give its bid fair consideration in accordance with statutory procedures is entitled to recover the reasonable cost of preparing its bid. Peabody Construction Co., 28 Mass.App.Ct. at 105; Paul Sardella Construction Co. v. Braintree Housing Authority, 3 Mass.App.Ct. 326, 333 (1975), aff'd, 371 Mass. 235 (1976). Under such circumstances, the payment ofbid preparation costs as damages is sufficient sanction to ensure compliance with bidding laws. Roblin Hope Industries, Inc., 6 Mass.App.Ct. at 490. In the present case, where the City’s award of the dairy contract to Baby G violated Chapter 30B, but did not involve bad faith, White’s is entitled to recover damages in the sum of five hundred dollars, which is the amount it cost White’s to prepare its bid in response to the Invitation. [11]
ORDER
For the foregoing reasons, it is hereby ORDERED that judgment enter in favor of plaintiff White’s Farm Dairy, Inc. in the amount of five hundred dollars and no cents ($500.00) against the defendant City of New Bedford.

 If it had been clear that specification six was inapplicable, some vendors may have submitted lower per-item bids on the milk products.

 I do not credit Carvalho’s testimony that chocolate milk constitutes 84 percent of the milk delivered to the New Bedford Public Schools. The estimated per-day usage in the Invitation, which is based on the previous year’s usage, demonstrates that chocolate milk constitutes only 44.44 percent of the milk delivered. Only if the universe of milk deliveries is deemed to consist solely of chocolate milk, skim milk and low fat milk does chocolate milk constitute 84 percent of the total; skim milk would be 3 percent of that total, and low fat milk would be 13 percent.

 The School Department uses approximately 6,635 units of chocolate milk per day for 180 days, which amounts to 1,194,300 units. In addition, the School Department uses an aggregate of 14,256 units of chocolate milk during the summer months. During the school year and during the summer, a total of 1,208,556 units of chocolate milk are used. Leaving aside the cost of the coolers, it would have cost the City $ 169,076.98 to purchase its chocolate milk from White’s and $171,735.80 to purchase its chocolate milk from Baby G. The $2,658.82 in savings by purchasing chocolate milk from White’s would be entirely lost if the School Department had to pay White’s $3,780.00 for coolers, $3,780.00 being 84 percent of the $4,500.00 that would be charged to the City by White’s for coolers.

 The daily usage of 6,635 units of chocolate milk during the school year multiplied by White’s bid produces the sum of $928.24; those units multiplied by Baby G’s bid produces the sum of $942.83. The difference between these two sums is $14.59. Thus, after subtracting $10.36 for the cost of the coolers attributable to chocolate milk, the City would have saved $4.61 per day by purchasing chocolate milk from White’s instead of from Baby G.

 Sixteen thousand dollars represents White’s anticipated profit on supplying chocolate milk, skim milk and low fat milk to the School Department. Had White’s won the chocolate milk contract, it undoubtedly would have supplied all the other dairy products as well, a fact understood by White’s when it prepared its bid.

 This action was not filed until November 6, 1998.

 The letter from White’s counsel to the Ciiy Solicitor that was forwarded to the Inspector General was not introduced into evidence.

 “I don’t know what you mean by ‘glory,’ ” Alice said.
Humpty Dumpty smiled contemptuously. “Of course you don’t — till I tell you. I meant ‘there’s a nice knock-down argument for you!’ ”
“But ‘glory’ doesn’t mean ‘a nice knock-down argument,’ ” Alice objected.
“When I use a word,” Humpty Dumpty said, in rather a scornful tone, “it means just what I choose it to mean— neither more nor less.”
‘The question is, ” said Alice, “whether you can make words mean so many different things.”
‘The question is," said Humpty Dumpty, “which is to be master — that’s all.”
L. Carroll, Through The Looking-Glass 79 (Macmillan Co. ed. 1966).

 See also T&T Janitorial Services & Sales, Inc. v. Everett, 6 Mass. L. Rptr. No. 9, 171 (January 27, 1997) (Cowin, J.) (concluding that city improperly awarded contract based on productive man hours where specifications indicated that award would be made according to total contract price).

 White’s deprived itself of a meaningful opportunity to obtain rebidding of the contract by waiting until November 6, 1998 to file this action and seek a preliminary injunction. Nothing in Chapter 30B required White’s to pursue an investigation with the Inspector General prior to seeking equitable relief.